Max John COLEMAN, Jr. and Green
Foliage and Supply, Inc.,
Appellants

v.

Debbie Ann COLEMAN, Independent
Executrix of the Estate of Robert
Lee Coleman, Deceased, Appellee.

No. 05–04–00600–CV.

Court of Appeals of Texas,
Dallas.

Aug. 17, 2005.

John D. Copeland, Dallas, for Appellants.

James B. Martin, Dallas, for Appellee.

Before Justices BRIDGES, O'NEILL, and MAZZANT.

## OPINION

Opinion by Justice O'NEILL.

This case concerns the disposition of a business partnership between brothers after one of them died. Max Coleman, the surviving partner, appeals the judgment

awarding the redemption value of his brother's partnership interest to his widow, Debbie Coleman. In five issues, Max asserts that (1) as a transferee of his brother's interest, Debbie is not entitled to receive the redemption value of the partnership interest; (2) the trial court erred in excluding evidence of an alleged oral "buy-sell" agreement whereby life-insurance proceeds would be used to buy out a deceased partner's interest; (3) the amount of setoff and credits the trial court awarded was not supported by the evidence; (4) the value of Robert's interest, held by Debbie as a transferee, was not supported by the evidence; and (5) the trial court erred in awarding Debbie attorney fees and costs. We affirm the trial court's judgment.

## Facts

Brothers Max and Robert Coleman were equal partners in a business begun in 1980. Initially, they bought green plants in Florida and shipped them to Texas, but the business eventually evolved into a trucking firm that worked mostly for one client. The business operated principally under the partnership entitled Coleman Properties, using as well the beneficially owned corporation Green Foliage and Supply, Inc. for certain business purposes (collectively, the Partnership).

On December 1, 2001, Robert committed suicide. Max continued to operate the business, advancing Robert's salary to his widow, Debbie Coleman, and paying certain of her expenses after Robert's death. Debbie, the named beneficiary to a life insurance policy in Robert's name, collected the proceeds on the policy. Debbie sought recovery of the value of Robert's interest in the Partnership, demanding that Max wind up the business and distribute the proceeds. Max continued to operate the business and use the Partnership assets, operating under the newly registered name Coleman Logistics. Subsequently, Debbie sued Max, demanding the "redemption value" of Robert's interest in the Partnership.

After a bench trial, the trial court determined, among other things, that (1) Debbie gave notice to wind up but Max failed to do so, (2) Debbie was entitled to the redemption price for Robert's interest, and (3) Max never tendered the redemption price. The trial court rendered judgment against Max, discounting the redemption value of Robert's interest by 15% because of "lack of control," as Debbie was a transferee of the interest and not a partner. The court awarded Debbie the amount of $161,500, less certain amounts for a setoff and credit for payments made by Max, plus attorney fees for $20,000 and certain costs. Max's motion for new trial was overruled by operation of law, and he filed this appeal.

## I. Redemption or Distribution of Capital Account

In his first issue, Max argues that under the relevant statute, Debbie is a transferee of Robert's interest, not a partner, and thus she is not entitled to receive the "redemption price" for Robert's partnership interest. Rather, Max argues, the statutory provision governing distribution upon the winding up of a partnership applies, thus affording Debbie only the positive balance in Robert's capital account at the time of his death.

**Standard of Review and Statutory Construction**

Because statutory construction is a question of law, we review the trial court's conclusions de novo. *McIntyre v. Ramirez*, 109 S.W.3d 741, 745 (Tex.2003). Our primary objective when construing a statute is to ascertain and give effect to the legislature's intent. *Id.* We look first to the plain and common meaning of the

language of the statute. *Id.; see* TEX. GOV'T CODE ANN. § 312.002 (Vernon 2005). We must read the statute as a whole and not just isolated portions. *Tex. Dep't. of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 642 (Tex.2004). We also consider the objective the law seeks to obtain and the consequences of a particular construction. *Id.; see* TEX. GOV'T CODE ANN. § 312.006 (revised statutes to be liberally construed to achieve their purpose and promote justice).

### The Texas Revised Partnership Act

It is undisputed that Max and Robert did not have a written partnership agreement. It is also undisputed that the partnership was not for a particular term, for a specified undertaking, nor was a winding up required upon the occurrence of a specified event. Thus, the parties agree that the Partnership was a "partnership at will."

█ The Texas Revised Partnership Act (TRPA) governs the relations between partners when the partners have not agreed otherwise. TEX.REV.CIV. STAT. ANN. arts. 6132b—1.03(a) (Vernon 2004–05) (hereinafter "TRPA"). The structure of the TRPA provides two ways for a departing partner to recover the value of his or her partnership interest: (1) through disposition of the partnership assets upon the winding up of the partnership, under TRPA § 8.06, or (2) if the partnership business is continued, through the buyout of the withdrawing partner's interest by the remaining partners, under TRPA § 7.01. *See* Comment of the Bar Committee—1993 to section 7.01 ("Article VII is new and provides for the redemption (buyout) of a withdrawn partner's interest in lieu of winding up the business of the partnership.")

Section 8.01 governs the winding up of a partnership. It provides that notice from a partner of a partnership at will constitutes an event requiring a winding up, but provides that a majority in interest may elect to continue the partnership.[1] The rules for distribution upon a winding up require that assets first be applied to debts and next to "settle partnership accounts among the partners."[2] Section 8.06(b) governs the settlement procedures and provides, among other things, that "the profits and losses that result from the liquidation of the partnership property must be credited and charged to the partners' capital accounts."[3]

---

1. Section 8.01(g) states in pertinent part:

 (g) **Notice from Partner if No Term or Undertaking; Option to Continue.** If a partnership is not for a definite term or a particular undertaking and its partnership agreement does not provide for a specified event requiring a winding up, a request for winding up the partnership from a partner ... requires a winding up 60 days after the date of the partnership's receipt of notice of the request or at a later date as specified by the notice, unless a majority-in-interest of the partners agree to continue the partnership.

2. Section 8.06(a) states:

 (a) **Application of Property to Obligations.** In winding up the partnership business, the property of the partnership, including the contributions of the partners required by this section, must be applied to discharge its obligations to creditors, including, to the extent permitted by other applicable law, partners who are creditors other than in their capacities as partners. Any surplus must be applied to pay in cash the net amount distributable to partners in accordance with their right to distributions under Subsection (b).

3. Section 8.06(b) provides that

 (b) **Settlement of Accounts Among Partners.** Each partner is entitled to a settlement of all partnership accounts on winding up the partnership business. In settling accounts among the partners, the partnership interest of a withdrawn partner that is not redeemed under Section 7.01 is credit-

The Bar Committee's Comment to Section 8.01 states that, if the majority owners agree to continue the partnership, "the notifying partner's interest is redeemed per Section 7.01." Section 7.01, entitled "Redemption of Withdrawing Partner or Transferee's Interest if Partnership Not Wound Up," entitles a withdrawn partner to redeem his or her interest as follows:

> (a) **Redemption.** If an event of withdrawal occurs ... and an event requiring a winding up does not occur within 60 days after the date of the withdrawal, ... the partnership interest of the withdrawn partner automatically is redeemed by the partnership as of the date of withdrawal in accordance with this section.

TRPA § 7.01. The "redemption price" is the "fair value" of the interest as of the date of withdrawal. *Id.* § 7.01(b). The Comment to that section refers to "redemption" as a "buyout."

One event of withdrawal that triggers redemption is a "partner's death." *Id.* § 6.01(7)(A). Upon the death of a partner, the partner's surviving spouse and his or her heirs become "transferees" of the partnership interest from the partner. *Id.* § 5.04(b).

■ Max argues that Debbie is entitled at most to any positive balance in Robert's capital account, according to the provision governing distribution upon the winding up of a partnership. *Id.* § 8.06(b). Specifically, he argues that Debbie is a "transferee" of Robert's interest, not a partner, and only partners are entitled to the redemption price under the literal terms of section 7.01(a). Further, he argues, section 7.01(n) is the *exclusive* provision for a transferee to redeem an interest, and Debbie does not qualify under that subsection.[4] That is, section 7.01(n) provides a mechanism for redemption by a transferee of an interest in a partnership that is for a specific term or purpose, but not for a transferee of an interest in a partnership at will, as is the case here. Thus, Max argues, Debbie is entitled at most to any positive balance in Robert's capital account under the winding up provisions in section 8.06(b).

We cannot agree with the construction of TRPA urged by Max. Section 8.06(b) requires that "the profits and losses that result from the liquidation of the partnership property must be credited and charged to the partners' capital accounts." The trial court found that Max did not wind up the business. It is undisputed that Max did not liquidate the business but continued to use the Partnership assets to operate the same business. Nonetheless, with no liquidation, Max urges that the

---

ed with a share of any profits for the period after the partner's withdrawal but is charged with a share of losses for that period only to the extent of profits credited for that period, and the profits and losses that result from the liquidation of the partnership property must be credited and charged to the partners' capital accounts. The partnership shall make a distribution to a partner in an amount equal to that partner's positive balance in the partners' capital accounts....

4. Section 7.01(n) deals with the obligation to redeem a transferee's interest in a partnership that is not a "partnership at will":

(n) **Obligation to Redeem Transferee.** A partnership must redeem the partnership interest of a transferee for its fair value if:

(1) the interest was transferred when:

(A) the partnership was for a definite term not then expired or a particular undertaking not then completed; or

(B) the partnership agreement provided for winding up on a specified event that has not yet occurred;

(2) the definite term has expired, the particular undertaking has been completed, or the specified event has occurred; and

(3) the transferee makes a written demand for redemption.

portion of section 8.06(b) entitling a partner to the positive balance in the capital account should apply.

Max also argues that section 7.01(n) is the *exclusive* means by which a transferee may realize a redemption, or buyout, of a partnership interest and Debbie does not meet the criteria of section 7.01(n). We note that, on its face, section 7.01(n) does not apply to a partnership at will. We look to the overall structure of the statute to ascertain legislative intent. *Sunset Valley*, 146 S.W.3d at 642. The structure reveals the intent that a partnership interest be recoverable in one of two ways, through distribution upon a winding up of the partnership or through a buyout by the remaining partner(s) if the business continues. In the circumstances, the provision governing distribution upon a winding up does not apply because Max did not liquidate the business. Further, the legislative intent is clear that, under 7.01(a), had Robert elected when he was alive to withdraw voluntarily from the Partnership, he would have been entitled to receive the redemption value under section 7.01(a). We see no need to read the provisions governing redemption so narrowly as to deny his widow the right to receive the redemption price when the surviving partner uses partnership assets to continue the same business. We resolve Max's first issue against him.

## II. Exclusion of Testimony under Dead Man's Rule

The trial court refused to allow Max to testify about an alleged oral agreement with Robert whereby each partner's life-insurance policy would fund the buyout of his respective partnership interest. The trial court determined that the evidence offered to corroborate Max's testimony was not sufficient to corroborate the terms of the alleged agreement and thus Max's testimony was inadmissible under the Dead Man's Rule. Max asserts this was error, arguing that the documentary evidence and the testimony of the insurance agent, Milford Mach, was sufficient to corroborate Max's testimony.

### Standard of Review

Evidentiary rulings are committed to the trial court's sound discretion. *Owens–Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex.1998). The test is whether the court acted without reference to any guiding rules or principles, or whether its action was arbitrary or unreasonable. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985).

Rule 601(b) of the rules of evidence provides in pertinent part:

(b) 'Dead Man's Rule' in Civil Actions. In civil actions by or against executors ..., neither party shall be allowed to testify against the others as to any oral statement by the testator, intestate or ward, unless that testimony to the oral statement is corroborated or unless the witness is called at the trial to testify thereto by the opposite party; ... Except for the foregoing, a witness is not precluded from giving evidence of or concerning any transaction with, any conversations with, any admissions of, or statement by, a deceased ... merely because the witness is a party to the action or a person interested in the event thereof.

Tex.R. Evid. 601(b).

Texas courts construe the Dead Man's Statute narrowly. *Quitta v. Fossati*, 808 S.W.2d 636, 641 (Tex.App.-Corpus Christi 1991, writ denied) (citing *Lewis v. Foster*, 621 S.W.2d 400, 404 (Tex. 1981)). The rule does not prohibit testimony concerning statements by the deceased that are properly corroborated.

*See id.* Corroborating evidence must tend to support some of the material allegations or issues that are raised by the pleadings and testified to by the witness whose evidence is sought to be corroborated. *Id.* It may come from any other competent witness or other legal source, including documentary evidence. *Id.* Corroborating evidence need not be sufficient standing alone to support the verdict, but must tend to confirm and strengthen the testimony of the witness and show the probability of its truth. *Id.* It is sufficient, for instance, if the corroborating evidence shows conduct by the deceased that is generally consistent with the testimony concerning the deceased's statements. *Id.*

**Analysis and Conclusion**

▇▇▇▇ Debbie asserts that Max failed to preserve error on this issue, by failing to make an offer of proof as to what his testimony would be. Rule 103(a)(2) of the rules of evidence provides that error may not be predicated upon a ruling which excludes evidence unless a substantial right of the party is affected, and the substance of the objection was made known to the trial court by offer of proof. *Ludlow v. DeBerry,* 959 S.W.2d 265, 269–70 (Tex.App.-Houston [14th Dist.] 1997, no writ). To preserve error adequately and effectively, an offer of proof must show the nature of the evidence specifically enough so that the reviewing court can determine its admissibility. *Bohatch v. Butler & Binion,* 905 S.W.2d 597, 607 (Tex.App.-Houston [14th Dist.] 1995), *aff'd,* 977 S.W.2d 543 (Tex.1998).

We note that when Max was asked whether he and Robert had an agreement that the insurance proceeds would be used to buy out the deceased partner's interest, Max answered "yes." In the circumstances, we conclude this response was specific enough to show the nature of the testimony Max would offer so as to preserve error.

▇▇▇▇ We cannot, however, conclude that the trial court abused its discretion in excluding Max's testimony. Although there is evidence the Partnership paid the premium, the insurance policy covered Robert as the insured and named Debbie as the beneficiary. The policy did not list the Partnership as owner or beneficiary. Although Mach testified there were general discussions amongst him, Max, and Robert as to the merits of using insurance to fund a buyout, and that the brothers were "agreeable" to such an arrangement, Mach did not testify to personal knowledge of any key terms the brothers had actually agreed upon, e.g., whether or not the $100,000 was to be the full buyout price for the deceased partner's interest. We cannot conclude that the trial court abused its discretion in ruling as it did. We resolve Max's second issue against him.

**III. Setoff and Credits**

In his third issue, Max asserts that the evidence is legally and factually insufficient to support the amount of setoff and credits awarded Max against the redemption price. The trial court found that Max was entitled to a setoff in the amount of $17,800 for advances made to Robert in excess of those taken by Max, as well as a $28,000 credit for payments made to Debbie after Robert's death. Max argues he proved excess advances to Robert totaling some $27,006 and credits totaling $35,612.

**Standard of Review**

▇▇▇▇ The standard of review for legal sufficiency is whether the proffered evidence as a whole "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499 (Tex.1995) (quoting *Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10,

25 (Tex.1994)). We view the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex.1998).

■ If the party challenging the legal sufficiency of a finding did not have the burden of proof on the issue, the party must demonstrate there is no evidence to support that finding. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex.1983). We uphold the finding if it is supported by more than a scintilla of evidence. *Burroughs Wellcome*, 907 S.W.2d at 499. If a party challenging the legal sufficiency of an adverse finding did have the burden of proof on the issue, the party must demonstrate that the evidence conclusively established all vital facts in support of the issue. *Smith v. Central Freight Lines, Inc.*, 774 S.W.2d 411, 412 (Tex.App.-Houston [14th Dist.] 1989, writ denied).

■ Concerning the scope of review for legal sufficiency, we credit all favorable evidence that a reasonable factfinder could believe and disregard all contrary evidence unless a reasonable factfinder could not ignore it. *See City of Keller v. Wilson*, 168 S.W.3d 802 (Tex.2005). When reviewing findings of fact for factual sufficiency, we consider and weigh all of the evidence and set aside the finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

**Analysis and Conclusion**

■ Max asserts he conclusively showed he was entitled to $27,006, not $17,800, for advances taken by Robert above those taken by Max. Max testified the partnership advanced Robert $7,046 for rent for Robert's daughter in college, $4,483 for his son's car, and $15,477 for funds expended on Robert's motorcycle. Although Max asserted these expenses exceeded those that he took, he produced no listing of monies he drew out in the same time period. Yet, he conceded that the Partnership had paid his daughter's tuition during the relevant time period.

Because Max had the burden of proof on this issue, in our legal-sufficiency review, we examine whether he conclusively established all vital facts in support of the amounts he asserts he was owed as a setoff. *Smith*, 774 S.W.2d at 412. We cannot conclude that the evidence conclusively proves an amount larger than the $17,800 awarded. Neither can we conclude, after weighing all of the evidence, that the finding of $17,800 is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.

■ Max testified that he made over $35,612 in payments to Debbie after Robert's death, not merely $28,000 as found by the trial court. His testimony indicates he had a document itemizing those payments, but it is not in the record before us. Debbie testified that Max made post-death payments of about "thirty, thirty-five thousand." This included a documented $19,200 in continuing payments of Robert's salary. Debbie's testimony, however, indicated that the $30–35,000 figure also included payment of her daughter's rent while in college (about $7,000, accounted for in the setoff) and payment on the heating and air conditioning system at their residence. Debbie testified that the system was installed before her husband's death, that Max had a system installed in his home, and that both were being paid over time through the Partnership. Thus, the evidence supports the conclusion that Debbie's receipt of payments on the heating and air conditioning system does not represent a benefit above what Max re-

ceived. Accordingly, the evidence does not conclusively prove Max was entitled to a credit for $35,612. Weighing all the evidence, we cannot conclude the award of $28,000 in credit is against the great weight and preponderance of the evidence. Accordingly, we resolve Max's third issue against him.

## IV. Valuation of the 50% Interest Held by Debbie

 In his fourth issue, Max challenges the legal and factual sufficiency of the evidence to support the valuation of Robert's 50% partnership interest, as held by Debbie as a transferee. The trial court found the value of the Partnership to be $380,000. Max challenges the valuation by Debbie's expert, Robert Dohmeyer, on a number of grounds. Because Max did not have the burden of proof on valuation, in reviewing for legal sufficiency, we examine the evidence to ascertain whether there is more than a scintilla of evidence to support the challenged finding. *Smith,* 774 S.W.2d at 412.

Max complains that Dohmeyer valued the business as of December 31, not December 1, 2001, which was the date of death. We note that Dohmeyer testified, nonetheless, that the value as of December 1 was not materially different than the value as of December 31. This is more than a scintilla of evidence to support the conclusion that Dohmeyer's valuation was valid as of December 31.

Dohmeyer's report stated a going-concern value of $373,909. Max asserts that he used inaccurate values for assets and liabilities as a basis for the valuation. Max testified that the correct values are those he had obtained from valuations of the individual pieces of equipment and the liabilities against each. We note the evidence shows that Dohmeyer's figures came from the Partnership's 2001 tax return and

conclude this constitutes more than a scintilla of evidence to support the use of that data.

Max asserts the evidence was legally and factually insufficient to support the trial court's finding that the value of the partnership was $380,000, as the maximum figure Dohmeyer testified to was $373,909. Our review of the evidence shows that there was evidence to support the higher value of $380,000. At trial, Max challenged certain data that Dohmeyer had used to attribute additional income to the partners. For her part, Debbie contended at trial that the Partnership owned two additional parcels of land, which had not been included in Dohmeyer's valuation for the business. In post-trial argument, Debbie adjusted the figures to correct for the income errors Max had asserted and added back value consistent with her evidence at trial. With these adjustments, Debbie's final valuation totaled $407,500. This constitutes more than a scintilla of evidence to support the value of $380,000.

In reviewing for factual sufficiency, we note that Max testified, based on the valuations of pieces of equipment he had obtained, that the debt was greater than the equipment was worth. Max, however, did not present an expert to value the business as a going concern. He testified that he originally thought the business was worth $120,000, but he now understood that "due to the offsets of long-term debt, the positives of receivables and things like that, there is a higher value to be ascertained." We cannot conclude that the trial court's finding that the Partnership was worth $380,000 is against the great weight and preponderance of the evidence.

 Max also argued that Dohmeyer failed to evaluate the interest as a "transferee interest," failing to account for the lack of control and lack of a non-compete

agreement by Max. Max also complained the use of 15% as a discount factor was unsupported. The record shows that Dohmeyer testified, "in all my prior work where I've had this come up," that a 10 to 15% discount was applied to a 50% interest. We note that Max did not object to Dohmeyer's qualification as an expert, nor did he raise a *Daubert* challenge to this testimony. *See E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 557 (Tex.1995) (expert testimony unreliable if no more than subjective belief or unsupported speculation, quoting *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 590, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)).

We conclude that there is more than a scintilla of evidence to support the trial court's discounting of the interest at 15%. Further, we cannot conclude that this finding is against the great weight and preponderance of the evidence. Accordingly, we resolve Max's fourth issue against him.

In his fifth issue, Max asserts that the trial court erred in awarding Debbie attorney fees and costs, because she was entitled to no recovery. Having concluded that Debbie is entitled to receive the redemption price, we resolve this issue against Max.

Accordingly, we **AFFIRM** the trial court's judgment.