**Mark H. HENRY, M.D., Appellant,**

v.

**Marcos V. MASSON, M.D., Appellee.**

**No. 01–07–00522–CV.**

Court of Appeals of Texas,
Houston (1st Dist.).

Dec. 30, 2010.

Timothy A. Hootman, Houston, TX, for Appellant.

Darryl W. Malone, George R. Gibson, Houston, TX, for Appellee.

Panel consists of Justices KEYES, ALCALA, and WILSON.*

* The Honorable Davie L. Wilson, retired Justice, First Court of Appeals, sitting by assign-

## OPINION

EVELYN V. KEYES, Justice.

In five issues, appellant Mark Henry, M.D., ("Henry") challenges (1) the legal sufficiency of the evidence to support the jury's verdict that Henry first breached a material obligation of a Settlement Agreement between himself and appellee Marcos Masson, M.D. ("Masson"); (2) the legal sufficiency of the evidence to support the jury's verdict awarding Masson damages for loss of the benefit of the bargain and expenses; (3) and (4) the trial court's finding that he was not entitled to either an offset of $150,000 in the judgment or the return of real property (the "Hepburn Estates") that was one of the subjects of the Settlement Agreement; and (5) the trial court's summary judgments in favor of Masson with respect to Henry's claims to the Hepburn Estates based on releases in the Settlement Agreement. In two issues on supplemental briefing, Henry also questions (6) the finality of the trial court's judgment and (7) our jurisdiction over this appeal.

We overrule Henry's first and second issues and hold that the evidence is legally sufficient to support the jury's finding that Henry materially breached the contract first and that Masson is entitled to recover $75,000 in benefit of the bargain damages from Henry. We sustain Henry's third, fourth, and fifth issues and hold that the trial court erred in granting Masson's motion for summary judgment on the ground that Henry executed valid releases of these claims pursuant to the Settlement Agreement and that Henry is therefore entitled to an offset in the judgment or a return of the real property. We overrule Henry's sixth and seventh issues and hold

ment.

that the trial court's judgment is a final order and that we have jurisdiction over this appeal.

In four issues on cross-appeal, Masson complains that the trial court erred in (1) ordering Masson and Henry to make capital contributions to the Partnership, (2) rendering judgment in favor of entities that were not parties to the suit, (3) not granting Masson a jury trial or an evidentiary hearing prior to entering judgment incorporating the receiver's finding, and (4) not directing a verdict against Henry for money Masson alleges was improperly taken out of the Partnership. We overrule Masson's issues on appeal.

We affirm in part and reverse and remand in part.

## BACKGROUND

This appeal is the culmination of years of bitter personal and business disputes between Henry and Masson. Henry and Masson were partners in an orthopedic surgery practice in Houston, Texas, forming a limited liability partnership, Houston Hand and Upper Extremity L.L.P. (the "Partnership" or "Houston Hand"), in January 2001 to conduct their medical practice. Less than three years later, on July 23, 2003, as the result of ongoing personal disputes between Henry and Masson and business disputes over the management and control of the Partnership, Masson filed this suit, as *Masson v. Henry*, No. 2003–40678, against Henry and a Partnership employee for various causes of action including breach of contract, business disparagement, defamation, breach of fiduciary duty, plus declaratory and injunctive relief. He also requested the appointment of a receiver for the Partnership and sought a judicial decree requiring the winding up of the partnership. Henry counterclaimed against Masson for breach

of contract, conversion, fraud, and breach of fiduciary duty. During a hearing in December 2003, Henry and Masson agreed in principle to wind up Houston Hand and to sever all ties to each other.

On March 2, 2004, within one year of the filing of *Masson v. Henry*, Henry filed an additional lawsuit, *Henry v. Masson, Hepburn Estates, L.P., and Hepburn Investments, L.L.C.*, No. 2004–11097 ("the Hepburn Lawsuit"), against Masson and entities in which they both had ownership interests.[1] In that suit, Henry alleged that Masson committed fraud, violated the Texas Securities Act, and breached fiduciary duties owed to Henry when he unilaterally used Partnership funds to purchase the Hepburn Estates and failed to disclose the presence of contaminants on the property and other "critical information" about the property in an effort to secure Henry's investment in the Hepburn Entities.

In an attempt to resolve all of their differences, Henry and Masson were ordered to mediation on March 19, 2004. At the mediation, Masson and Henry executed a Settlement Agreement, attempting to buy final peace from each other in the plethora of lawsuits swirling around their relationship. There were three major parts to this Settlement Agreement.

First the parties agreed to wind up the Partnership and "physically separate their practices as soon as is reasonably practical." The handwritten part of the Agreement provides that:

The parties agree to execute

- "windup steps" in the form of Ex B subject to updating dates & conforming it to comply w/ the terms of this settlement [agreement].

. . . .

---

1. Henry and Masson created Hepburn Estates, L.P., and Hepburn Investments, L.L.C.

(the "Hepburn Entities"), to conduct transactions involving the Hepburn Estates property.

The parties agree to physically separate their practices as soon as is reasonably practical.

In accordance with this agreement, a critical part of winding up and separating the parties' practices was the preparation and execution of a document entitled "Houston Hand & Upper Extremity Center Windup Steps" ("Windup Steps"), a draft of which was attached to the Settlement Agreement as Exhibit B. This document was to set forth the timetable, sequence of events, details, and third parties to be involved for each step of the windup process. The Windup Steps were also to provide for an accounting firm, Frost & Company, P.C. ("Frost"), to serve as a neutral administrator to oversee and facilitate the wind up.

Second, the parties agreed that Henry would sell Masson his ownership interest in a disputed piece of property known as the Hepburn Estates, in exchange for Masson's paying Henry $150,000 in cash. The Settlement Agreement provided in pertinent part that:

> Dr. Masson agrees to buy and Dr. Henry agrees to sell to Dr. Masson Dr. Henry's interest in Hepburn Estates for $150,000 cash, at the time of physical separation.

Third, Henry and Masson agreed to release all claims against each other, except for the agreements in the Settlement Agreement itself, to buy peace from this litigation. The Agreement stated:

> Except for the agreements set forth herein, [footnote 1] the parties hereby agree to release, discharge, and forever hold the other harmless from any and all claims ... arising from or related to the events and transactions which are the subject matter of this cause.

A handwritten note in the margin stated, "Specifically carve out Lundy and Global." A handwritten footnote one stated, "The parties agree that neither Masson nor Henry is releasing any claims they may have against Sean Lundy; Global Orthopedics." Originally written into footnote one, but lined through, were the words "and/or Hepburn Estates/Hepburn Estates LLC or any Hepburn entity." The Settlement Agreement was initialed on each page by both Henry and Masson.

The parties agreed that Henry's lawyers would deliver the first drafts of the revised Windup Steps and all other necessary documents to Masson, and that they would do so within fourteen days of the date that the parties signed the Settlement Agreement. These initial draft documents were to reflect Henry's understanding regarding the terms of the Agreement, and the parties were then to work from the documents to prepare final drafts to be executed. The Agreement provided in pertinent part:

> *Counsel for [Henry] shall deliver drafts of any further documents* to be executed in connection with this settlement *to counsel for the other parties hereto within 14 days from the date hereof.* The parties and their counsel agree to cooperate with each other in the drafting and execution of such additional documents as are reasonably requested or required to implement the provisions and spirit of this Settlement Agreement, but notwithstanding such additional documents the parties confirm that this is a written settlement agreement as contemplated by Section 154.071 of the Texas Civil Practice and Remedies Code.

(Emphasis added).

The Agreement was executed on March 19, 2004. Over the next ten days, Masson failed to receive any drafts from Henry or Henry's attorney. On March 29—four days before the deadline for Henry and his lawyers to submit Henry's proposed drafts—Masson's lawyers circulated drafts

of the documents they thought necessary to complete the settlement.

By the April 1, 2004 deadline, Henry still had not provided Masson with a draft of the revised Windup Steps or of any other documents. Instead, Henry asserted that Masson's circulated documents did not comport with the Agreement, and he therefore refused to initiate the windup of the Partnership, or even completion of the settlement, until the issues he raised regarding Masson's documents had been corrected. Henry also refused to give permission for the neutral administrator, Frost, to take any steps to initiate the windup or to complete the Agreement because Henry asserted that it did not make sense to proceed until his issues regarding the documents provided by Masson had been resolved. Although Henry took issue with the contents of the draft documents from Masson's lawyers, there is no evidence that Henry tendered to Masson any alternative draft documents to be considered prior to April 16, 2004. The settlement and windup were thus "stuck in neutral," with Frost unable to proceed with the windup and separation until Henry gave his permission to do so and with Henry refusing to give permission because he disagreed with the contents of the documents submitted by Masson.

On April 5, 2004, Masson notified Henry that he needed Henry to give his permission for the windup to go forward because Masson was going to physically separate his practice from the Partnership on April 16, 2004. In a flurry of e-mails and phone calls, Henry and his attorneys vigorously protested any move toward separation, citing the language contained in the initial version of the Windup Steps attached as an exhibit to the Settlement Agreement, which stated that *"no initiation* of the [windup] steps shall begin until" both Henry and Masson had given their permission to proceed. Nevertheless, on April 16,

2004, Masson physically separated his practice from Henry's and began a new practice under the name Reconstructive Orthopedic Center, P.A. ("ROC"). Henry then began his own practice under the name of Hand and Wrist Center of Houston, P.A. ("Hand and Wrist").

Subsequently, Henry deeded title to the Hepburn Estates to Masson in accordance with the Settlement Agreement but Masson did not pay Henry the $150,000 promised in return in the Agreement. The parties attempted to mediate a resolution to allow the windup to go forward but were unsuccessful. Henry and Masson amended their claims in this action to seek recovery against each other for breach of the Settlement Agreement.

On November 15, 2004, a jury trial was held regarding the parties' alleged breaches of the Settlement Agreement. No question was submitted to the jury on the substance of either party's breach, but only on the fact of breach by each party for failure to comply with the Settlement Agreement. The jury found that both parties had materially breached the Agreement, but that Masson's breach was excused because Henry had materially breached the Agreement first. After the verdict, the trial court did not enter final judgment. Rather, it retained jurisdiction over the dispute pending windup of the partnership under the Settlement Agreement, which all parties and the court treated as remaining in effect. An order issued by the trial court on March 7, 2005, expressly stated that it was not a final judgment and that the court reserved the right "to enter judgment on the damages awarded to ... Masson against ... Henry and to grant such other relief to which the parties may be entitled." The court appointed a receiver, Scott Mitchell, for the partnership and made other rulings affecting the rights of the parties, including

ordering contributions to the Partnership for the payment of third party debts. There was no objection to the appointment of the receiver.

The court later severed some claims and consolidated others, including consolidating with this case, *Masson v. Henry*, claims filed by Masson reasserting claims of breach against Henry that arose prior to the November 15, 2004 trial, asserting continuing violations of the Settlement Agreement and the Windup Steps, and seeking injunctive, declaratory, and monetary relief.

On March 6, 2006, Masson moved for summary judgment against Henry in *Henry v. Masson, Hepburn Estates, L.P., and Hepburn Investments, L.L.C.*, the Hepburn Lawsuit, which was later consolidated with this suit. Masson sought a declaration that Henry's Hepburn Estates claims were released by the March 19, 2004 Settlement Agreement, that the jury had also rejected Henry's claims for payment for the Hepburn Estates property, and that Henry was barred by res judicata and collateral estoppel from asserting his claims for payment for the property.

On April 14, 2006, the trial court marked up and signed the Summary Judgment Order attached to Masson's summary judgment motion. The court rendered summary judgment against Henry "due to the settlement and release agreement dated March 19, 2004 signed by Masson and Henry."

On November 20, 2006, the court entered an order concluding, as a matter of law, that because the jury had found that Henry breached the Settlement Agreement first, Masson was excused from further performance. The court also found that Henry's transfer of the Hepburn Estates to Masson was undisputed and that the only evidence at trial of the amount of money owed to Henry was the $150,000 stated in the Settlement Agreement. It further concluded, as a matter of law, that the Settlement Agreement was an indivisible contract. The court implicitly concluded that, because the contract was indivisible, Masson was excused by Henry's prior breach from paying Henry the $150,000 agreed upon in the Settlement Agreement for the Hepburn Estates. The court made this implicit conclusion express by signing a second order on December 21, 2006, "hold[ing] that the settlement agreement is indivisible and that therefore Henry is not entitled to a credit of $150,000 for the transfer of the Hepburn Estate."

A final judgment was rendered by the trial court in May 2007 in the consolidated cases based upon the jury's verdict, the summary judgments granted by the trial court to Masson and to the Hepburn Entities, and the receiver's findings. The trial court entered judgment in favor of Masson on his breach of contract claim against Henry and awarded him $75,000 in actual damages, $25,000 in attorney's fees, costs, and pre- and post-judgment interest. The judgment ordered that Henry take nothing on his claims against Masson. Further, the judgment ordered both Henry and Masson to make capital contributions to the Partnership in order to fund payments the Partnership owed to their respective new entities, stating:

> . . . Houston Hand is granted judgment for capital contribution under Article 4.2 of the Agreement of Partnership of Houston Hand for sums owed to Hand and Wrist Center of Houston, P.A. for the sum of $148,000.00; 50% ($74,000.00) of which Mark H. Henry is required to contribute to Houston Hand and 50% ($74,000.00) of which Marcos V. Masson is required to contribute to Houston Hand. It is further
>
> ORDERED that Houston Hand is granted judgment for capital contribution under Article 4.2 of the Agreement

of Partnership of Houston Hand for sums owed to ROC Houston, P.A. for the sum of $29,000.00; 50% ($14,500.00) of which Mark H. Henry is required to contribute to Houston Hand and 50% ($14,500.00) of which Marcos V. Masson is required to contribute to Houston Hand.

The Judgment also stated:

It is further

ORDERED that the Court's Orders dated April 24, 2006, July 10, 2006, November 17, 2006, and December 21, 2006 are incorporated herein by reference and made a part of this Final Judgment.

It is further

ORDERED that all acts of the Receiver taken during the pendency of this receivership are hereby confirmed, approved and ratified; the receivership is closed and the Receiver is discharged, his bond is released, and his surety discharged.

It is further

ORDERED that this is a final and appealable judgment.

The same day the Final Judgment issued, the trial court also signed an "Order on Sixth Report of Court–Appointed Receiver." The trial court found that the receiver had "completed all duties and responsibilities assigned to him by the Court, save and except the filing of Houston Hand and Upper Extremity Center, L.L.P.'s federal income tax returns." The order authorized Mitchell, the receiver, to file Houston Hand's 2006 federal income tax return and to destroy all documents maintained in storage. The order required Masson and Henry to pay the costs of the receivership, including legal fees. The order also stated that the court "discharges Mitchell as Receiver of the Partnership and closes the receivership of the Partnership upon notification by Mitchell that the Partnership's 2006 federal income tax return has been filed, the final account-ing adjustments ... have been made, the remaining Partnership records have been destroyed; and the balance of any remaining funds on hand have been distributed to Houston Hand's partners."

Both parties appeal from the Final Judgment.

## HENRY'S ISSUES

### I. Jurisdiction/Order on Sixth Report

At the outset, we address Henry's claim, made in his supplemental briefing, that this Court lacks jurisdiction over this appeal. Henry argues that the Order on Sixth Report of Court–Appointed Receiver "only closes the receivership upon Mitchell taking certain acts, and all acts taken by Mitchell must be approved by the Court." Accordingly, Henry argues that the Final Judgment is a contingent judgment and that we, therefore, lack jurisdiction over this appeal. Alternatively, Henry argues that the Order is void. We disagree with both contentions.

■ Henry cites several Texas cases to the effect that, "[u]nless there is a statute authorizing interlocutory appeal, the Texas appellate courts have jurisdiction only over final judgments." *Cherokee Water Co. v. Ross*, 698 S.W.2d 363, 365 (Tex.1985). However, certain orders entered by a trial court in a receivership proceeding are treated as final appealable orders. Generally, if a trial court in a receivership action enters an order resolving a discrete issue in connection with the receivership, that order has the same force and effect as any other final adjudication of a court, and thus the order is final and appealable. *See, e.g., Huston v. F.D.I.C.*, 800 S.W.2d 845, 846–47 (Tex.1990) (opinion on reh'g); *see also Moody v. State*, 520 S.W.2d 452, 457 (Tex.Civ.App.-Austin 1975, writ ref'd n.r.e.) (judgment final even though receiver was subject to further review and order

of Alabama court); *State v. Starley*, 413 S.W.2d 451, 464 (Tex.Civ.App.-Corpus Christi 1967, no writ) (discussing "one final judgment" rule and observing some exceptions, including "the case of receiverships ... where the court can and must enforce its decree.").

Further, *Lehmann v. Har–Con Corp.*, one of the cases Henry cites, itself acknowledges that certain post-judgment orders may be necessary to carry out the relief ordered in a final judgment, especially as in "some probate and receivership proceedings, in which multiple judgments final for purposes of appeal can be rendered on certain discrete issues." 39 S.W.3d 191, 192, 195 (Tex.2001).

Accordingly, the Final Judgment in this case is indeed final and we have jurisdiction over this appeal. Similarly, the Order on Sixth Report of Court–Appointed Receiver is not invalid on the grounds Henry asserts. We overrule Henry's jurisdictional issues.

## II. First Material Breach of Settlement Agreement

In his first issue, Henry complains that the evidence is legally insufficient to support the jury's finding that he committed the first material breach of the Settlement Agreement.

### A. Standard of Review

In deciding whether legally sufficient evidence supports a challenged finding, we must consider evidence favorable to the finding if a reasonable fact finder could consider it and disregard evidence contrary to the finding unless a reasonable fact finder could not disregard it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822, 827 (Tex.2005). Circumstantial evidence may be used to establish any material fact, but it must establish more than mere suspicion. *Lozano v. Lozano*, 52 S.W.3d 141, 149 (Tex.2001) (citing *Browning–Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 928 (Tex.

1993)). Only reasonable inferences drawn from the known circumstances establish a material fact. *Id.* (stating that inference is merely deduction from proven facts). We consider the totality of the known circumstances in determining the legal sufficiency of the circumstantial evidence and the reasonable inferences to be drawn from it. *See Felker v. Petrolon, Inc.*, 929 S.W.2d 460, 464 (Tex.App.-Houston [1st Dist.] 1996, writ denied).

When an appellant attacks the legal sufficiency of an adverse finding on an issue on which he did not have the burden of proof, he must demonstrate that no evidence supports the finding. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex.1983). When attacking the legal sufficiency of the evidence to support an adverse finding on an issue on which he had the burden of proof, an appellant must demonstrate that the evidence conclusively established all vital facts in support of the issue. *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex.1989); *Marrs & Smith P'ship v. D.K. Boyd Oil & Gas Co.*, 223 S.W.3d 1, 13–14 (Tex.App.-El Paso 2005, pet. denied). The materiality of Henry's breach of the Settlement Agreement was an issue on which Masson carried the burden of proof. *See, e.g., City of The Colony v. N. Tex. Mun. Water Dist.*, 272 S.W.3d 699, 746 (Tex. App.-Fort Worth 2008) (noting that excused performance of contract due to other party's prior material breach is affirmative defense). Accordingly, we review the record to determine whether there was no evidence to support the jury's finding that Henry's failure to provide the initial drafts of the Windup Steps and the requisite settlement documents was a material breach of the Settlement Agreement.

### B. Analysis

▉ Henry admits that he breached the Settlement Agreement by failing to deliver the initial drafts of the Windup Steps and

all other necessary documents within fourteen days of the date that the Settlement Agreement was signed. Henry also admits that his breach occurred before any breach of the Settlement Agreement by Masson. Nevertheless, Henry argues that his breach could not have been a "material" breach because, before the fourteen day deadline had expired, Masson's lawyers delivered their own drafts of the requisite settlement documents to Henry's lawyers. Henry argues that this delivery makes "Henry's lawyers' requirement to deliver the documents redundant and pointless—the documents were already delivered so why deliver them again?" In other words, Henry argues that, because the parties had Masson's drafts from which to complete the settlement within fourteen days of the signing of the Settlement Agreement, Henry's failure to timely provide his drafts of the documents could not be a material breach. Given the facts of this case, we disagree.

 "A breach of contract occurs when a party fails to perform an act that it has expressly or impliedly promised to perform." *Case Corp. v. Hi–Class Bus. Sys. of Am., Inc.*, 184 S.W.3d 760, 769–70 (Tex.App.-Dallas 2005, pet. denied). A material breach by one party to a contract can excuse the other party from any obligation to perform. *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex.2004) (per curiam) ("It is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance."); *Hernandez v. Gulf Grp. Lloyds*, 875 S.W.2d 691, 692 (Tex.1994). The materiality of a breach—the question of whether a party's breach of a contract will render the contract unenforceable—generally presents a dispute for resolution by the trier of fact. *See Cont'l Dredging, Inc. v. De–Kaizered, Inc.*, 120 S.W.3d 380, 394–95 (Tex.App.-Texarkana 2003, pet. de-

nied) (citing *Hudson v. Wakefield*, 645 S.W.2d 427, 430 (Tex.1983)); Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Business, Consumer, Insurance, Employment* PJC 101.21–.22 (2008) (proposing jury question on whether defendant's failure to comply with contract was excused, and instructing that defendant's failure to comply is excused by plaintiff's previous failure to comply with material obligation of same agreement).

Here, Question No. 3 of the trial court's charge asked the jury, "Who first failed to comply with a material obligation of the Settlement Agreement, Dr. Marcos Masson or Dr. Mark Henry?" Tracking the Texas Supreme Court's holding in *Mustang Pipeline Co.*, the question instructed the jury that the circumstances to be considered in determining whether a breach of an agreement is material included:

(a) the extent to which the injured party will be deprived of the benefit he reasonably expected;

(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of the circumstances including any reasonable assurances; [and]

(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*See Mustang Pipeline Co.*, 134 S.W.3d at 199 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 241 (1981)). The jury answered, "Dr. Mark Henry."

Upon reviewing the record, we conclude that there was legally sufficient evidence to support a jury finding under Question No. 3 that Henry materially breached the Settlement Agreement by failing to timely deliver the drafts of the Windup Steps. Contrary to Henry's arguments, there was evidence that, to Masson, it was an important benefit of the Settlement Agreement to timely possess Henry's drafts reflecting Henry's understanding of the Settlement Agreement and the documents necessary to complete the settlement and that the parties work from Henry's draft—and not Masson's—in finalizing the settlement.

It is undisputed that the drafts contemplated by the Settlement Agreement were critical to the timely completion of the settlement. Masson testified that, prior to the Settlement Agreement, he and Henry had significant problems in running the Partnership, including Masson's allegation that Henry deprived Masson of $113,000 worth of partnership draws to which he was entitled. Masson stated at trial that, as he was recently married, he was "very low on cash" and thus needed to begin his own practice, separate from the Partnership, as soon as possible. In addition, Masson testified that Henry's actions made it difficult for Masson to see patients—according to Masson, Henry limited the number of patients and the type of injuries Masson was allowed to treat. Masson also testified that Henry changed the locks in the office and refused to allow Masson access to administrative support and even office supplies before the time Masson physically separated his practice. To that end, Masson testified that the Settlement Agreement meant that he and Henry mutually agreed to separate their practices "as soon as was practical."

The Settlement Agreement called for Henry to circulate the initial draft of the Windup Steps, and the Agreement also called for the parties to cooperate. Masson testified that he attempted to comply with the "spirit" of the Agreement by circulating documents even though the Settlement Agreement called for Henry to circulate his own proposals first. Masson's attempts met with silence from Henry. Even as Masson began to remove his possessions, equipment, and records from the Partnership offices, Henry still refused to agree to—or, more importantly, even to propose—a sequence of timing of the Windup Steps, effectively "stonewalling" Masson and forcing Masson to proceed with the separation of practices on his own and at his own risk. Henry also refused to agree to the division of the software license Masson needed to have a copy of the software the Partnership used to maintain client files. Masson testified that Henry objected to winding up the Partnership on a "piecemeal" basis, but that he believed Henry's objections were specious and that Henry was simply trying to continue to prevent Masson from opening and operating his own practice.

Thus, the evidence established a history of hostility between Henry and Masson [2] and a corresponding likelihood that Henry would object to drafts comings from either Masson or his lawyers and thereby delay both the settlement and the start of Masson's new practice. Masson testified at trial that this is exactly what happened—that his expectation in signing the Settlement Agreement requiring Henry to make the first attempt at proposing the specific timing and sequence for the Windup Steps was that the separation of practices would thereby be expedited. Henry's failure to

---

2. Although they were once good friends—with Henry having served as the best man in Masson's wedding—by the time of the Settlement Agreement there was bitter mistrust and animosity between the parties, ranging from name calling to allegations of theft and fraud.

meet his obligations and comply with his obligation to circulate the drafts, combined with his refusal to work from Masson's drafts, thus destroyed the very purpose of the Windup Steps provisions of the Settlement Agreement.

Thus, it was reasonable for the jury to conclude that Masson agreed to require Henry to provide the first drafts, reflecting Henry's understanding of the Settlement Agreement, in order to prevent Henry from delaying the settlement and windup by disagreeing with the contents of the drafts or by accusing Masson of trying to "change the deal" and take advantage of Henry in these documents. Such conduct by Henry would result in additional attorney's fees and "another set of nightmares and interactions" between Henry and Masson, would completely undermine the peace that Masson expected to achieve from the Settlement Agreement, and would delay the start of Masson's new practice. Given the conduct of the parties and their attitudes regarding the dispute, the jury had sufficient evidence to conclude it far more likely that Masson could live with Henry's drafts easier than Henry could live with Masson's drafts.

As the record reflects, when Henry breached the Settlement Agreement by never providing his drafts, the only documents that the parties had to work from to complete the settlement were the drafts from Masson's lawyers. Henry disagreed with the contents of Masson's drafts, accused Masson and his lawyers of bad faith in preparing the drafts, and refused to work with the drafts, so that a large part of the settlement collapsed, resulting in litigation for breach of the Settlement Agreement, the appointment of a receiver, years of uncertainty about the status of Henry and Masson's practices, and additional attorney's fees and litigation costs that continue unabated to this day. Thus, Masson's reasonable fears were realized.

The evidence also demonstrates that there was little likelihood that Henry planned to cure his breach and that his actions were in bad faith. Masson testified that he believed that Henry's breach was in bad faith and an attempt to delay the settlement and to cost Masson additional time and expense in setting up his new practice. There was evidence produced at trial to support this testimony. There was also significant evidence from both parties regarding their history of bitter hostility toward one another. Furthermore, Henry failed to produce the requisite drafts either by the April 1, 2004 deadline in the Settlement Agreement or by April 16, 2004, the date Masson breached the Settlement Agreement by leaving the Partnership to form his new practice.

There is no evidence in the record showing that Henry made any efforts to even prepare the drafts by the April 1, 2004 deadline. Likewise, although Henry asserts that the documents circulated by Masson's lawyers did not comply with the Settlement Agreement, there is no evidence that, between the date that the Settlement Agreement was signed on March 19, 2004, and the April 1, 2004 deadline, Henry ever provided any drafts *that did conform* to the Settlement Agreement as he understood it to be. In fact, while Henry attempted to explain to the jury the discrepancy between his deposition testimony and his testimony at trial, the jury heard Henry's sworn deposition testimony establishing that he "did not do anything to initiate the windup steps" after the signing of the Settlement Agreement. There is also evidence that, just days after the Settlement Agreement had been signed, Henry attempted to delay an initial meeting suggested by Frost with the other parties identified in the Windup Steps to

"initiate the windup and ensure we have a timeline that works for all parties" until after all the remaining settlement documents—which his lawyers were responsible for preparing and never did prepare—had been signed.

In light of this evidence, the jury could have reasonably disbelieved Henry's contention that his breach of the Settlement Agreement and his disagreement with the documents submitted by Masson's lawyers were in good faith. We conclude that all of this evidence, when viewed in light of the instructions given to the jury regarding the factors to be considered in determining the materiality of a breach, is legally sufficient to support the jury's finding in Question 3. Accordingly, we overrule Henry's first issue.

### III. Damages

■ In his second issue, Henry argues that there is legally insufficient evidence "to support the jury verdict that Dr. Masson was damaged for (i) 'loss of the benefit of the bargain' and (ii) expenses that did not benefit Houston Hand." We disagree.

■ A jury has broad discretion in assessing damages. *First State Bank v. Keilman,* 851 S.W.2d 914, 930 (Tex.App.-Austin 1993, writ denied). A jury's findings will not be disregarded merely because the jury's reasoning in arriving at its figures may be unclear. *See, e.g., Pleasant v. Bradford,* 260 S.W.3d 546, 559–60 (Tex.App.-Austin 2008, pet. denied) (damages award not arbitrary simply because it did not match up precisely with figures presented by expert witnesses).

In this case, the jury concluded that the damages caused to Dr. Masson by Dr. Henry's breach were the "[l]oss of the benefit of the bargain: furniture $75,000." We conclude that there was legally sufficient evidence at trial that this amount represents the benefit of the bargain that

Masson expected to receive from the settlement.

Masson's trial testimony and the Windup Steps establish that, under the Settlement Agreement, Masson expected an equitable division of the Partnership's furniture, fixtures and equipment. Each partner had a 50% interest in the Partnership and the stated goal of the division of Partnership property under the Settlement Agreement was to achieve "fundamental fairness" to each partner. One of the exhibits the jury considered in reaching its damages award was an "FFE," a list of Partnership furniture, fixtures and equipment prepared by Frost for the windup which never occurred. The FFE contained two lists: a list of "Henry Non-like Kind Assets" and a list of "Masson Non-like Kind Assets." Each list set forth partnership assets that one of the two partners held that did not match up with another identical (or similar) asset held by the other partner. Frost's analysis showed that Dr. Henry possessed non-like assets that had a total value of $161,650.09, and Dr. Masson possessed non-like assets that had a total value of $11,582.46. The jury could have reasonably derived its $75,000 damages number through the calculation below to achieve an equitable 50% division of Partnership property per Masson's expectation of the Settlement Agreement.

$161,650.09 (in Henry's possession)

- $11,582.46 (in Masson's possession)

$150,067.63 (the difference between the value of Partnership assets possessed by Henry versus the value of assets possessed by Masson)

$150,067.63 divided by two partners = $75,033.82 per partner (or approximately $75,000)

These amounts were also discussed by Henry at trial:

Masson's counsel: Now, the next section, "Value and use of assets in Dr. Henry's possession," how many pages is your list?

Henry: Of the property that's sitting in that space, it's less than three pages.

Masson's counsel: And what's the value placed on that?

Henry: As you already said, $161,650.09.

. . . .

Masson's counsel: Let's go to the next chart here, "The value and use of assets in Dr. Masson's possession." Can you count how many pages that is?

Henry: A half a page.

Masson's counsel: What's the value in Dr. Masson's possession?

Henry: The value says $11,582.46

Masson's counsel: What is, sir, the disparity, the unequalization, the difference between the value in use of assets in your possession and the value in use of the assets in Dr. Masson's possession as shown in Exhibit 17?

Henry: Very close to $150,000.

Thus, the $75,000 award granted to Dr. Masson by the jury in this case is well within the range of evidence presented at trial. *See, e.g., Gulf States Utils. Co. v. Low,* 79 S.W.3d 561, 566 (Tex.2002).

Nevertheless, Henry argues that there is legally insufficient evidence to support this damage award because the jury's finding is contrary to the language of the Settlement Agreement reflecting the parties' "clear intent . . . to sell the items and then divide the proceeds." We disagree. This argument is directly contrary to the plain language of Section IV of the Windup Steps, approved by the parties in Exhibit B. The Windup Steps reflect that the parties did not intend for all of Partnership assets to be sold and the proceeds split between the parties. To the contrary, the Windup Steps set up a detailed sequence of events allowing Henry and Masson to select the Partnership property that they wanted to use in their new practices and it provided for an evaluation by Frost of the selected property to make sure that each party received an equal value of furniture, fixture and equipment upon the windup. Pursuant to the Windup Steps, the only items to be sold for proceeds to be distributed to the parties were items that neither Henry nor Masson wanted to use in their new practices.

Next, as a sub-argument, Henry asserts that the trial court's award of attorney's fees should also be set aside because (1) there is legally insufficient evidence to support the jury's finding in Question No. 3 that Henry's breach of the Settlement Agreement was material and (2) the damage award to Masson of $75,000 should be set aside. Because we have concluded that Henry's first breach was material and that Masson was entitled to $75,000 in damages, we disagree. Accordingly, we overrule Henry's second issue.

## IV. $150,000 Offset or Return of Title to Hepburn Estates Real Property

■ In his third issue, Henry argues that, assuming he was the first to materially breach the Settlement Agreement, the trial court erred by not awarding him an offset judgment in the amount of $150,000 because he tendered the Hepburn Estates to Masson as required under Settlement Agreement and Masson never paid him the required amount under the Settlement Agreement.

Henry makes the following argument:

Assuming a material breach of the Settlement Agreement in fact occurred, the inquiry as to the $150,000/Hepburn question is not over. That is because the law requires that Masson, being confronted with Henry's first breach, must elect between *continuing* performance

of the Settlement Agreement, and *ceasing* performance of the Settlement Agreement. Masson has, as a matter of law, elected that the Settlement Agreement continues because (i) he has sued for damages under the agreement, (ii) he seeks to keep Henry's interest in the Hepburn property, (iii) he seeks to enforce the wind up provision, and (iv) he seeks to enforce the mutual release. Suing for damages and treating the portion of the agreement that gives him Henry's interest in the Hepburn property as continuing deprives Masson of any excuse for terminating his own performance of paying the agreed $150,000. By electing that the settlement agreement continues, he must therefore perform his obligations under the contract; that is, pay the $150,000.

(Citations omitted).

Masson argues, however, that Henry transferred the Hepburn Estates to him under the terms of the Settlement Agreement; the Settlement Agreement contained a release of all of Henry's claims against Masson and the Hepburn Entities, which held the Hepburn Estates; the jury determined that Henry breached the settlement agreement first; therefore, Masson's obligation to pay Henry the $150,000 for the property under the terms of the Settlement Agreement was excused and Henry's claims against him were released. As Henry puts Masson's argument: "Masson [argues] that (i) the portion of the [settlement] agreement giving him Henry's interest in the Hepburn property *continues,* but that (ii) the portion requiring Masson to pay $150,000 for the Hepburn property *ceases;* that (iii) the release *continues* against Henry's enforcing the $150,000 obligation created by the settlement agreement, but that (iv) it *ceases* as to Masson suing Henry for past grievances; and that (v) the wind-up portion of the agreement *continues.*"

■ "It is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance." *BFI Waste Sys. of N. Am. v. N. Alamo Water Supply Corp.,* 251 S.W.3d 30, 30–31 (Tex. 2008) (per curiam) (quoting *Mustang Pipeline Co.,* 134 S.W.3d at 196). However, if, after the breach, the non-breaching party continues to insist on performance by the party in default, "the previous breach constitutes no excuse for nonperformance on the part of the party not in default and the contract continues in force for the benefit of both parties." *Chilton Ins. Co. v. Pate & Pate Enters., Inc.,* 930 S.W.2d 877, 887 (Tex.App.-San Antonio 1996, writ denied) (quoting *Houston Belt & Terminal Ry. v. J. Weingarten Inc.,* 421 S.W.2d 431, 435 (Tex.Civ.App.-Houston [1st Dist.] 1967, writ ref'd n.r.e.)); *see also Gupta v. E. Idaho Tumor Inst., Inc.,* 140 S.W.3d 747, 756 (Tex.App.-Houston [14th Dist.] 2004, pet. denied). The non-breaching party must thus elect between two courses of action—continuing performance under the contract or ceasing to perform. *Gupta,* 140 S.W.3d at 757 n. 7; *Chilton,* 930 S.W.2d at 887.

■ If the non-breaching party treats the contract as continuing after the breach, he is deprived of any excuse for terminating his own performance. *Long Trusts v. Griffin,* 222 S.W.3d 412, 415–16 (Tex.2007) (per curiam); *Hanks v. GAB Bus. Servs., Inc.,* 644 S.W.2d 707, 708 (Tex. 1982); *Gupta,* 140 S.W.3d at 756; *Chilton,* 930 S.W.2d at 887; *W. Irrigation Co. v. Reeves Cnty. Land Co.,* 233 S.W.2d 599, 602 (Tex.Civ.App.-El Paso 1950, no writ). The election affects only whether the non-breaching party is required to perform fully after the breach. *Gupta,* 140 S.W.3d at 757 n. 7.

Seeking to benefit from the contract after the breach operates as a conclusive choice depriving the non-breaching party of an excuse for his own non-performance. *Hanks,* 644 S.W.2d at 708; *Chilton,* 930 S.W.2d at 888; *Cox, Colton, Stoner, Starr & Co., P.C. v. Deloitte, Haskins, & Sells,* 672 S.W.2d 282, 286–87 (Tex.App.-El Paso 1984, no writ). If the non-breaching party elects to treat the contract as continuing after a breach and continues to demand performance, it obligates itself to perform fully. *See Long Trusts,* 222 S.W.3d at 415–16 (holding that by claiming as damages share of lawsuit recovery, which was benefit of bargain, non-breaching party treated oil and gas operating agreement not as terminated but as continuing and thus "could not cease to share in the expenses and still insist in sharing in the recovery"); *Hanks,* 644 S.W.2d at 708 (holding that by choosing to treat contract for sale of business as continuing after other party's breach of covenant not to compete and by retaining all assets of business and continuing its operation, non-breaching party waived any right it had to partially rescind contract); *Gupta,* 140 S.W.3d at 757–58 (holding that when non-breaching party elected to treat joint venture agreement in full force and effect after alleged breaches at beginning of agreement and continued to demand performance of opposing party, party's failure to comply with agreement was not excused).

Here, the record shows that the jury trial addressed only breaches of the Settlement Agreement alleged to have occurred between the date of the Agreement, March 19, 2004, and the date of trial, November 15, 2004. These included Henry's breach of the Agreement by failing to provide Masson with a draft of the Windup Steps as agreed and Masson's breach by failing to pay Henry $150,000 for the Hepburn Estates property transferred to him by Henry.

Following the trial, Masson continued to retain the benefits of the Agreement, including the title to the Hepburn Estates, and the parties treated the Settlement Agreement and the Windup Steps as continuing in accordance with the terms of the Agreement and as subject to the jurisdiction of the trial court until final judgment was entered by that court on May 21, 2007. After the trial, Masson moved that a receiver be appointed to ensure performance of the Windup Steps. The trial court appointed a receiver and retained jurisdiction over the case until all of the Windup Steps were completed and the receiver discharged, to the benefit of the parties, and only then did it enter final judgment. During the time it retained jurisdiction, the court severed and consolidated claims and entered interlocutory summary judgments. The final judgment disposed of all claims in the consolidated cases. It not only awarded damages to Masson in accordance with the November 2004 jury verdict, but also finalized the summary judgment awarded by the trial court to Masson on Henry's Hepburn Estates claim in accordance with the trial court's construction of the Settlement Agreement on April 24, 2006, and it discharged the receiver.

The uncontroverted evidence that the parties continued to treat the Settlement Agreement and Windup Steps as continuing and that Masson continued to retain the benefits of the Settlement Agreement, including title to the Hepburn Estates, conclusively establishes Masson's election to treat the Settlement Agreement and Windup Steps as continuing in effect after the November 2004 jury verdict in this case. Therefore, we hold that Masson's performance of his own obligations under the Settlement Agreement was not excused as a matter of law. *See Chilton,* 930 S.W.2d at 888; *Cox, Colton,* 672 S.W.2d at 286–87. Rather, having received the benefit of Henry's performance in tendering

title to the Hepburn Estates to him, and continuing to treat the Settlement Agreement and Windup Steps as continuing after Henry's breach, Masson was obligated to pay Henry $150,000 for the Hepburn Estates under the plain terms of the Settlement Agreement. *See Hanks*, 644 S.W.2d at 708–09; *Gupta*, 140 S.W.3d at 757 n. 7; *Cox, Colton*, 672 S.W.2d at 286–87. Therefore, the trial court erred in holding that Henry was not entitled to $150,000.[3]

We sustain Henry's third and fourth issues.

## V. Summary Judgments in Favor of Masson and Hepburn Entities.

▉ In his final issue, Henry asserts that the trial court erred in granting summary judgments in a related lawsuit that was consolidated with this case. We examine this contention below.

### A. Procedural Background

#### 1. *Henry v. Masson and the Hepburn Entities (Hepburn Lawsuit)*

Hepburn Estates, L.P. and Hepburn Investments, L.L.C. ("Hepburn Entities") were companies formed by Henry and

Masson for the purpose of conducting transactions involving the real property of the Hepburn Estates. Prior to the mediation in *Masson v. Henry*, on March 2, 2004, Henry filed the separate lawsuit styled *Mark Henry, M.D. v. Marcos Masson, M.D., Hepburn Estates, L.P. and Hepburn Investments, L.L.C.*, the "Hepburn Lawsuit." The Hepburn Lawsuit initially did not deal with the issues that were being litigated in this lawsuit. Instead, the Hepburn Lawsuit involved Masson's alleged misrepresentations and failure to disclose the presence of contaminants on the Hepburn Estates. On February 20, 2006, Henry amended his petition to add a claim against Masson for breach of contract based on Masson's failure to tender the $150,000 owed to Henry for the Hepburn Estates pursuant to the Settlement Agreement in the instant litigation.

#### 2. *Masson v. Henry (Masson Lawsuit)*

As discussed above, on July 23, 2003, Masson filed the action that is the subject of this appeal (the "Masson Lawsuit") against Henry, arising out of activities involving the Partnership. The parties were ordered to attend mediation, and at the

---

**3.** We note that the trial court concluded in its November 20, 2006 and December 21, 2006 orders that the contract Henry breached first was indivisible and that therefore, under *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex.2004) (per curiam) and *Summers v. WellTech, Inc.*, 935 S.W.2d 228, 232 (Tex.App.-Houston [1st Dist.] 1996, no writ), Henry was not entitled to a credit of $150,000 for the property. This was error. The principle of law stated in *Mustang Pipeline Co.* and cited by the trial court—that "when one party to a contract commits a material breach of that contract, the other party is discharged or excused from future performance"—applies only so long as the parties do not treat the contract as continuing in effect, as they did here. *See Mustang Pipeline Co.*, 134 S.W.3d at 196. The trial court's conclusion that the contract was indivisible and, therefore, "each and all parts and the

consideration shall be common to each other and interdependent," *Summers*, 935 S.W.2d at 232, mischaracterizes the Settlement Agreement at issue in this case. The consideration owed by Masson to Henry for the transfer of the Hepburn Estates property to him was not dependent on the execution of all other parts of the Agreement. It was dependent on the transfer of the property and was apportioned to it. *See Johnson v. Walker*, 824 S.W.2d 184, 187 (Tex.App.-Fort Worth 1991, writ denied) (defining divisible contract as one in which performance by one party consists of several distinct and separate items and price paid by other party is apportioned to each item). We are not bound by the trial court's erroneous conclusion of law. *See BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex.2002) (holding that appellate courts may review trial court's legal conclusions to determine their correctness).

mediation they executed the Settlement Agreement on March 19, 2004. Subsequently, on November 15, 2004, a jury trial was held regarding alleged breaches of that Agreement. The jury found that Henry had breached the Agreement first by failing to prepare papers for the Wind-up Steps and awarded Masson $75,000 for "furniture." It also found that Masson's subsequent breach, in failing to pay Henry $150,000 for the Hepburn Estates whose title Henry had transferred to Masson under the terms of the Settlement Agreement, was excused. Masson, however, elected to treat the contract as continuing and thereby became obligated to fulfill his end of the bargain by paying Henry the promised $150,000 for the Hepburn Estates, as set forth above.

### 3. Summary Judgments

Masson and the Hepburn Entities filed separate summary judgment motions under Texas Rule of Civil Procedure 166a(c) in the Hepburn Lawsuit, arguing that all of Henry's Hepburn Estates claims, including his claim against Masson for the payment of $150,000 for the property, were released by the March 19, 2004 Settlement Agreement, that the jury had already rejected Henry's claims for payment for the Hepburn Estates, and that the release barred Henry from further prosecution of the Hepburn Lawsuit under the doctrines of res judicata and collateral estoppel. Both motions were granted "due to the settlement and release agreement dated March 19, 2004 signed by Masson and Henry."[4] The Hepburn Lawsuit was subsequently consolidated with the Masson Lawsuit. Both summary judgments became final and appealable upon the entry of the final judgment in the Masson Law-

suit, with which the Hepburn Lawsuit had been consolidated, in May 2007.

### B. Standard of Review

To succeed on a summary judgment motion under Rule 166a(c), a movant must establish that there is no genuine issue of material fact so that the movant is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c); *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex. 1995). To conclusively establish a matter, the movant must show that reasonable minds could not differ as to the conclusion to be drawn from the evidence. *See City of Keller*, 168 S.W.3d at 814. The burden of proof is on the movant, and all doubts about the existence of a genuine issue of material fact are resolved against the movant. *See Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex.2002). If the movant establishes a right to summary judgment, the burden shifts to the non-movant to raise a genuine issue of material fact in order to defeat summary judgment. *See Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex.1995).

Release is an affirmative defense under the Texas Rules of Civil Procedure. *See* Tex.R. Civ. P. 94. A defendant is entitled to summary judgment based upon an affirmative defense when the defendant proves all elements of the affirmative defense. *See Havlen v. McDougall*, 22 S.W.3d 343, 345 (Tex.2000). We review de novo the trial court's rendition of a traditional motion for summary judgment. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex.2003).

In this case, the trial court granted both summary judgment motions on the ground that the release language contained in the Settlement Agreement barred Henry from

---

4. Masson moved for summary judgment on March 6, 2006, and the trial court rendered summary judgment in his favor on April 24, 2006. The Hepburn Entities moved for sum-

mary judgment on May 19, 2006, and the trial court rendered summary judgment in their favor on July 10, 2006.

continuing the prosecution of the Hepburn Lawsuit and from recovering the $150,000 for Henry's transfer of his interest in the Hepburn Estates to Masson pursuant to the Settlement Agreement.

▮▮▮▮▮ A release is a writing which provides that a duty or obligation owed to one party to the release is discharged immediately or upon the occurrence of a condition. *Nat'l Union Fire Ins. Co. v. Ins. Co. of N. Am.*, 955 S.W.2d 120, 127 (Tex.App.-Houston [14th Dist.] 1997), *aff'd sub nom. Keck, Mahin & Cate v. Nat'l Fire Ins. Co.*, 20 S.W.3d 692 (Tex.2000); *Baty v. ProTech Ins. Agency*, 63 S.W.3d 841, 848 (Tex.App.-Houston [14th Dist.] 2001, pet. denied). A release of a claim or cause of action extinguishes the claim or cause of action. *Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 508 (Tex.1993). Like any other agreement, a release is a contract subject to the rules of contract construction. *Baty*, 63 S.W.3d at 848; *see also Williams v. Glash*, 789 S.W.2d 261, 264 (Tex.1990). When construing a contract, the court must give effect to the true intentions of the parties as expressed in the written instrument. *Lenape Res. Corp. v. Tenn. Gas Pipeline Co.*, 925 S.W.2d 565, 574 (Tex.1996); *Doe v. Tex. Ass'n of Sch. Bds., Inc.*, 283 S.W.3d 451, 458 (Tex.App.-Fort Worth 2009, pet. denied); *Baty*, 63 S.W.3d at 848.

The contract must be read as whole, not by "isolating a certain phrase, sentence, or section of the agreement." *Baty*, 63 S.W.3d at 848. Rather, the court must examine the entire contract in an effort to harmonize and give effect to all of its provisions so that none are rendered meaningless and no single provision controls. *Doe*, 283 S.W.3d at 458. The language is to be given its plain grammatical meaning unless doing so would defeat the intent of the parties. *Baty*, 63 S.W.3d at 848; *see also Doe*, 283 S.W.3d at 458. A contract is unambiguous if it can be given a definite legal meaning. *Doe*, 283 S.W.3d at 458. The interpretation of an unambiguous contract is a matter of law to be determined by the trial court. *Gulf Ins. Co. v. Burns Motors, Inc.*, 22 S.W.3d 417, 423 (Tex.2000); *Doe*, 283 S.W.3d at 459.

▮▮▮▮▮ To effectively release a claim, the releasing instrument must mention the claim to be released. *Victoria Bank & Trust Co. v. Brady*, 811 S.W.2d 931, 938 (Tex.1991); *Baty*, 63 S.W.3d at 848. In construing a contract, the court may not rewrite it or add to its language. *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 162 (Tex.2003); *Doe*, 283 S.W.3d at 458. Claims that are not clearly within the subject matter of the release are not discharged, even if they exist when the release is executed. *Brady*, 811 S.W.2d at 938; *Baty*, 63 S.W.3d at 848. It is not necessary, however, that the parties anticipate and identify every potential cause of action relating to the subject matter of the release. *Keck, Mahin & Cate*, 20 S.W.3d at 698; *Baty*, 63 S.W.3d at 848. Although releases generally contemplate claims existing at the time of execution, a valid release may also encompass unknown claims and future damages. *Keck*, 20 S.W.3d at 698; *Baty*, 63 S.W.3d at 848. However, general categorical release clauses are narrowly construed. *Brady*, 811 S.W.2d at 938.

In support of their summary judgment motions, Masson and the Hepburn Entities presented the trial court with summary judgment evidence of the Settlement Agreement containing the release. The release provided:

*Except for the agreements set forth herein,* [footnote 1] *the parties hereby agree to release, discharge, and forever hold the other harmless from any and all claims . . . arising from or related to the*

events and transactions which are the subject matter of this cause.

(Emphasis added.) A handwritten note in the margin stated, "Specifically carve out Lundy and Global," and the handwritten footnote carved out from the release claims involving those relationships.

By its ordinary, generally accepted meaning, the terms of the release in the Settlement Agreement release and discharge the parties from any claim "arising from or related to the events and transactions which are the subject matter of this cause," "[e]xcept for the agreements set forth herein." One of the agreements expressly set forth in the Settlement Agreement executed by the parties was the agreement that:

> Dr. Masson agrees to buy and Dr. Henry agrees to sell to Dr. Masson Dr. Henry's interest in Hepburn Estates for $150,000 cash, at the time of physical separation.

We construe the ordinary meaning of the terms of the release to be that all claims "arising from or related to the events and transactions" which were the subject matter of *Masson v. Henry*, including the claims set out in the Hepburn Lawsuit, were released except for those set forth in the agreements made in the Settlement Agreement itself. Henry's claim for payment of $150,000 for his interest in the Hepburn Estates arose out of the express agreement in the Settlement Agreement itself that Henry transfer title to the Hepburn Estates to Masson and that Masson pay him $150,000 for the property. Therefore, according to the plain language of the release in that Settlement Agreement setting forth the parties' agreement to release all claims "arising from or related to . . . the subject matter of this cause," *"[e]xcept for the agreements set forth herein,"* Henry's claim for payment for the property transferred to him

under the express terms of the Agreement was not released.

Because the jury found that Henry violated the Settlement Agreement first, Masson could have accepted the damages properly awarded him by the jury, returned the property, and treated his own further performance as discharged. *See BFI Waste Sys.,* 251 S.W.3d at 30. But Masson did not do that. Instead, by benefiting from Henry's transfer of the Hepburn Estates to himself in accordance with the terms of the Settlement Agreement, Masson obligated himself to perform his side of the bargain by paying Henry for the property. *See Long Trusts,* 222 S.W.3d at 415–16; *Hanks,* 644 S.W.2d at 708; *Gupta,* 140 S.W.3d at 757 n. 7; *Chilton,* 930 S.W.2d at 888. Due to Henry's transfer of his interest to him, as well as his actions set forth in the preceding section, Masson treated the Settlement Agreement as continuing in effect. He could not both accept the benefit of the bargain he had made with Henry and deny his own obligation to perform his side of the bargain. *See Hanks,* 644 S.W.2d at 708–09; *Gupta,* 140 S.W.3d at 757 n. 7; *Cox, Colton,* 672 S.W.2d at 286–87. Therefore, by accepting title to the Hepburn Estates, Masson became obligated to pay Henry $150,000 because that claim, arising under the terms of the Settlement Agreement itself, was not released by the release in the Agreement. Masson, by failing to pay Henry for the property, breached the Agreement he had elected to treat as continuing in effect.

■ Masson points, however, to the handwritten footnote to the release in which the parties agreed "that neither Masson nor Henry is releasing any claims they may have against Sean Lundy; Global Orthopedics" and which originally continued with the scratched out words "and/or Hepburn Estates/Hepburn Es-

tates LLC or any Hepburn entity." Masson admits that the scratched out reference to the Hepburn Estates "evidences that the parties at one time contemplated carving out any and all claims regarding Hepburn from the release in the Settlement Agreement, but they chose not to do so and crossed through such language." He argues, nevertheless, that we should recognize this clearly revoked intention as evidence of Henry's intent to " 'buy peace' regarding the Hepburn Entities by conveying his entire interest in the Hepburn Entities and claiming the right to be paid under the Settlement Agreement," and "[a]ccordingly, because the Hepburn Entities were intended to be released from the Settlement Agreement, Dr. Henry was barred from bringing claims against them in the Hepburn lawsuit." We will not rewrite the release or add to its language. *See Schaefer,* 124 S.W.3d at 162; *Doe,* 283 S.W.3d at 458. Moreover, to credit Masson's argument that by choosing *not* to carve out claims related to the Hepburn Estates in the exemption to the release Masson and Henry evinced an intent that Henry's claim to payment for the Hepburn Estates under the Settlement Agreement be released would plainly violate the intent of the parties and would lead to an absurd result, in clear violation of the rules of contract construction. *See Lenape Res. Corp.,* 925 S.W.2d at 574; *Doe,* 283 S.W.3d at 458; *Baty,* 63 S.W.3d at 848.

We hold that the release set out in the Settlement Agreement in *Masson v. Henry* did not release Henry's claim to be paid $150,000 for the transfer of the Hepburn Estates to Masson. The trial court's summary judgment barring Henry from seeking payment for the property he had transferred to Masson "due to the settlement and release agreement dated March 19, 2004 signed by Masson and Henry" was clearly erroneous.

We sustain Henry's fifth issue.

## MASSON'S ISSUES

### I. Capital Contributions

■ Masson also raises several issues on appeal. First, he argues that the trial court erred in ordering Henry and himself to make capital contributions to the Partnership to allow the Partnership to pay out funds it had taken in that actually belonged to the two new entities run individually by Masson and Henry—ROC and Hand and Wrist. Masson bases this contention on his statement that the Partnership was a limited liability partnership and thus Masson and Henry were not liable for the debts of the Partnership. Masson's argument relies upon the repealed Article 6132b–3.08(a) of the Texas Revised Partnership Act ("TRPA"), which provided that partners are protected from individual liability for partnership debts and obligations incurred while the partnership is a properly registered limited liability partnership. Act of May 31, 1993, 73d Leg., R.S., ch. 917, § 1, sec. 3.08(a), 1993 Tex. Gen. Laws 3887, 3894 (expired Jan. 1, 2010). Masson does not cite any case law or statutes other than the TRPA itself for his argument.

"The [TRPA] governs the relations between partners when the partners have not agreed otherwise." *Coleman v. Coleman,* 170 S.W.3d 231, 236 (Tex.App.-Dallas 2005, pet. denied). Here, neither the Partnership Agreement nor the TRPA prevented the trial court from ordering the contributions to the Partnership during the windup. The payments the trial court ordered Henry and Masson to make were capital contributions to the Partnership to discharge the debts of the Partnership during windup, not an adjudication of individual liability for the Partnership's debts or obligations as contemplated by the TRPA. In fact, the Partnership Agree-

ment specifically contemplated such a contribution in Article 4.2:

> If the Partnership at any time has insufficient cash or other liquid assets to pay its debts, obligations and liabilities as the same become due and payable, each Partner shall have the right to lend to the Partnership such funds.... In the event no Partner agrees to lend such funds to the Partnership, each Partner shall be required to timely contribute as an additional contribution ("Additional Capital Contribution") to the Partnership an amount equal to (x) the funds required by the Partnership multiplied by (y) such Partner's Percentage Interest in the Partnership at the time of the call for additional funds.

Masson argues that because the Partnership was in the process of winding up this provision does not apply. Further, he contends that the Partnership Agreement elsewhere referred to payment of the Partnership's debts upon dissolution "to the extent funds are available" and that this phrase evidenced Henry and Masson's intent that they would not be required to make additional contributions during the winding up of the Partnership. We disagree. The phrase to which Masson refers occurs in Section 12.3, in a listing of steps to be taken after the sale of Partnership property, and the "funds" mentioned are funds received from the sale of the Partnership property. The fact that the Agreement provides for the payment of Partnership debts from the sale of Partnership property does not mean that the sale of Partnership property was the only source of funds to pay those debts.

Masson also argues that Section 4.2 requires capital contributions for the Partnership's debts as they become "due and payable" and that this language is evidence that the parties did not intend for Section 4.2 to require capital contributions during

windup. The Agreement is not so limited. The language to which Masson points modifies the type of debt to be paid, i.e., debt that is due and payable, and it does not put any such limitation on the "operational" status of the Partnership.

We overrule Masson's first issue.

## II. "Judgment in Favor" of Hand and Wrist and ROC

■ Masson's second issue complains that the trial court's judgment improperly awards a recovery to two entities that were not parties to the litigation—Hand and Wrist and ROC. Masson relies upon authorities such as Texas Rule of Civil Procedure 301, which states that "[t]he judgment of the court shall conform to the pleadings, the nature of the case proved and the verdict, if any...." Tex.R. Civ. P. 301. Masson characterizes the trial court's order that Henry and Masson make capital contributions so that the Partnership could pay the money it owed to these two entities as a "judgment in favor" of these two entities. Masson misreads the judgment, which states that judgment is granted to Houston Hand—the Partnership at the heart of the case and which Masson specifically pled be put into receivership—not the entities subsequently formed by Masson and Henry, Hand and Wrist and ROC. Although the names of these entities do appear in the judgment, they are references to the specific debts owed by the Partnership and the judgment does not award these entities any specific relief. As for the judgment granted to Houston Hand, Masson himself pled for the receivership, thus bringing Houston Hand into the litigation at issue. Thus, the judgment complies with Rule 301 and "conform[s] to the pleadings." *Id.*; *see also Kidwell v. Black*, 104 S.W.3d 686, 689 (Tex.App.-Fort Worth 2003, pet. denied) (where owner did not request re-

lief but lienholder's pleadings requested relief in favor of owner, including trial court reform deeds to reflect correct property description and that owner acquire title to the property by adverse possession, judgment in favor of owner complied with pleadings).

We overrule Masson's second issue.

### III. Entry of Judgment on Receiver's Findings

Masson's third issue complains that the trial court ordered the capital contributions "without a jury trial, proper pleadings, motions for and notice of a summary judgment, or summary judgment evidence."

 We first address Masson's contention that he had a right to a jury trial regarding the court's acceptance and incorporation of the receiver's findings in the judgment. "Traditionally, it has been held that the right to trial by jury does not extend to receivership proceedings." *Bergeron v. Sessions,* 561 S.W.2d 551, 555 (Tex.Civ.App.-Dallas 1977, writ ref'd n.r.e.) (citing *Moody v. State,* 538 S.W.2d 158, 161 (Tex.Civ.App.-Waco 1976, writ ref'd n.r.e.), *Ferguson v. Ferguson,* 210 S.W.2d 268, 269 (Tex.Civ.App.-Austin 1948, writ ref'd n.r.e.), and *McHenry v. Bankers' Trust Co.,* 206 S.W. 560, 572 (Tex.Civ.App.-Galveston 1918, writ ref'd)). "[S]ince receivership property is in custody of the law, its management and control is that of the court; jury intervention would impermissibly transfer control and management of the receivership from the court to the jury." *Id.* (citing *Ferguson,* 210 S.W.2d at 269). Masson was not entitled to a jury trial on the court's acceptance of, and entry of judgment based upon, the receiver's findings.

Next, we address Masson's broad contention that the trial court entered judgment incorporating the receiver's findings without allowing Masson an opportunity to respond via pleadings or an evidentiary hearing. The record demonstrates wholly otherwise. For example, the trial court's "Order Appointing Wind Up Representative," recited in relevant part

On the 13th day of December, 2004, this matter came *on for hearing* before the Court *on the application of Marcos V. Masson,* M.D. for entry of judgment and the appointment of a wind up representative for Houston Hand and Upper Extremity Center, L.L.P. (the "Partnership").... All parties appeared through their respective attorneys. *The Court read the pleadings, examined the evidence and heard the argument of counsel, and finds that a wind up representative should be appointed for the Partnership* to wind up the Partnership's business, as soon as reasonably practicable, and in the name of and for and on behalf of the Partnership. It is, therefore,

ORDERED that this Court finds that it is the express will of Marcos V. Masson and Mark H. Henry to wind up the Partnership....

. . . .

[S]uch wind up representative shall be and is hereby authorized to do any and all acts necessary for the proper and lawful wind up of the Partnership's business....

(Emphasis added).

The record on appeal does not contain any objections to this order. Further, the record shows that the trial court conducted at least three other hearings on the receiver's various reports and requests for capital contributions to the Partnership. We have not been provided a transcript of those hearings. No written objections to the orders granting the relief requested in the receiver's reports appear in the record.

Thus, the record on appeal reveals that Masson appeared through counsel at evidentiary hearings on the receivership and filed pleadings relating to the receivership and the receiver's actions, and that Masson himself requested the appointment of the receiver of whom he now complains. Further, there is no evidence that Masson objected to the entry of the receiver's reports or to the court's orders entered pursuant to those reports.

We overrule Masson's third issue.

## IV. Henry's $178,000 Withdrawal

Masson's fourth issue contends that the trial court erred in not directing a verdict against Henry for $178,000 that Masson alleges Henry improperly took from the Partnership. Masson contends that this withdrawal violated the Settlement Agreement because the Partnership still owed money to third parties, and the Settlement Agreement called for such debts to be paid before Henry and Masson withdrew funds for themselves. During trial, Masson's attorney requested that the jury charge include a question on disgorgement of profits. The trial court refused to submit the disgorgement question and the jury failed to award Masson $178,000 in breach of contract damages.

■ Masson first complains of the trial court's refusal to submit his requested question. We review a trial court's refusal to submit a particular question for an abuse of discretion. *Tex. Dep't of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990); *ASEP USA, Inc. v. Cole*, 199 S.W.3d 369, 376 (Tex.App.-Houston [1st Dist.] 2006, no pet.).

■ Disgorgement of profits is not a measure of damages available in a breach of contract action. "The normal measure of damages in a breach of contract case is the benefit of the bargain, the purpose of

which is to restore the injured party to the economic position it would have been in had the contract been performed." *City of The Colony*, 272 S.W.3d at 739. In contrast, disgorgement of profits is an equitable remedy, appropriate for causes of action such as breach of fiduciary duty. *See, e.g., ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 873 (Tex.2010) ("[C]ourts may fashion equitable remedies such as profit disgorgement and fee forfeiture to remedy a breach of fiduciary duty.").

■ Next, Masson complains that the trial court erred by failing to enter judgment, in spite of the jury's verdict, against Henry for $178,000. A party with the burden of proof at trial is entitled to judgment notwithstanding the verdict on a particular issue only if evidence establishes that issue as a matter of law. *See Cain v. Pruett*, 938 S.W.2d 152, 160 (Tex.App.-Dallas 1996, no writ). A trial court may not properly disregard a jury's negative finding and substitute its own affirmative finding unless the evidence conclusively establishes the issue. *Burns v. Resolution Trust Corp.*, 880 S.W.2d 149, 154 (Tex. App.-Houston [14th Dist.] 1994, no writ). Masson contends that there is no dispute that Henry withdrew $178,000 money from the Partnership account and that there is no dispute that Henry was not entitled to this money under the Settlement Agreement. Accordingly, Masson contends that the trial court should have entered judgment in his favor for the $178,000.

Masson does not present any evidence or argument on appeal, however, to show that he was actually damaged in this amount. In fact, the Settlement Agreement itself provides that he was entitled only to a limited portion of any funds in the Partnership's account, and then only after the Partnership used all of its available funds to pay third parties and its

other liabilities. Masson has failed to establish that the trial court erred by not entering judgment in his favor against Henry in the amount of $178,000.

We overrule Masson's fourth issue.

## CONCLUSION

We affirm in part and reverse and remand in part. We overrule all of Masson's issues on appeal and Henry's first, second, sixth and seventh issues. We sustain Henry's third, fourth, and fifth issues and remand the case to the trial court for further proceedings in accordance with this opinion.