**Opinion issued August 17, 2023**



In The

# Court of Appeals

For The

## First District of Texas

————————————

### NO. 01-21-00542-CV

————————————

**WOOD GROUP USA, INC., Appellant**

**V.**

**TARGA NGL PIPELINE COMPANY, LLC, Appellee**

---

**On Appeal from the 215th District Court**
**Harris County, Texas**
**Trial Court Case No. 2019-85546**

---

## MEMORANDUM OPINION

In this pipeline construction dispute, appellant Wood Group USA, Inc. sought additional payments through change order requests pursuant to a construction agreement between the parties. Appellee Targa NGL Pipeline Company, LLC refused to agree to the change order requests, asserting that the

requests were barred by the parties' agreement. Targa filed a suit for declaratory judgment, and Wood Group countersued alleging, among other claims, that Targa breached the parties' agreement. The trial court granted summary judgment in favor of Targa, denying Wood Group's counterclaims and rendering the declarations requested by Targa, including that Wood Group was not entitled to additional compensation under the parties' construction agreement.

On appeal, Wood Group advances issues challenging the summary judgment by arguing that (1) the trial court erred in rendering a take-nothing judgment on Wood Group's claim that Targa breached the terms of the agreement that required Targa to provide specific easements and workspaces because Targa made no argument for why it was entitled to summary judgment on that counterclaim; (2) the trial court erred in "nullifying" a portion of the agreement regarding Wood Group's rights following a force majeure event and declaring that Wood Group "is not entitled to receive any monetary compensation for delays relating to . . . Force Majeure events"; (3) the trial court misinterpreted the release-or-waiver provision in one of the parties' change orders and wrongly declared that it "constituted an accord and satisfaction of all claims . . . contained within" any subsequent change orders; and (4) the trial court erred in granting summary judgment based on Targa's allegations that Wood Group's contractually-required notices were untimely.

Based on the record, we hold that Targa proved that Wood Group's counterclaims fail as a matter of law, and Targa proved that it was entitled to the declarations rendered by the trial court. Accordingly, we affirm.

**Background**

In September 2018, Targa contracted with Wood Group, a construction contractor, to build an 80-mile section of Targa's Grand Prix NGL Pipeline System, a natural-gas liquid pipeline. The parties entered into the Construction Agreement on September 7, 2018, and work began on the pipeline on September 10, 2018. The initial contract price was $43 million, and the Agreement required Wood Group to finish the project by March 6, 2019.

Despite several delays and difficulties, Wood Group completed the pipeline construction project by July 3, 2020. During and immediately after construction, the parties agreed to several change orders that increased the contract price to $60,104,766.70, which Targa paid to Wood Group in December 2020. A dispute remained, however, regarding more than $25 million in additional costs. Wood Group claims that Targa still owes payment based on delays for which Targa was responsible or for which Targa bore the risk under the Agreement.

**A. Construction Agreement**

The Agreement used a "unit price" model to determine the total contract price. For example, the Agreement provided that Targa would pay $164.48 per

3

linear foot for the completion of horizontally directionally drilled (HDD) bores in dirt and $351.58 per linear foot for HDD bores in rock. The Agreement stated that this unit price "shall include, but not be limited to, excavation, . . . all HDD related activities such as set up and preparation of entry and exit hole work areas, boring and reaming, . . . and making tie-ins to the mainline." Stringing, welding, and other related activities were included in other unit prices set out in the Agreement. The Agreement originally provided that the total price was not to exceed $43 million, and it provided that "[t]he Contract Price is subject to adjustment only by Change Order as provided in Article 6" of the Agreement.

In order for Wood Group, as the Contractor, to perform the agreed-upon work, section 4.2 of the Agreement obligated Targa, the Owner, to provide Wood Group "with reasonable access to the Site on which the Pipeline is to be physically situated . . . sufficient to permit [Wood Group] to progress with the Work without material interruption or interference." The Agreement expressly referenced "Alignment Sheets" as providing the particular details of the access to the right of way and temporary workspaces necessary for Wood Group to do the work.

The Agreement set out the project schedule and provided for a "Guaranteed Substantial Completion Date" of February 28, 2019. It further provided for "Guaranteed Final Completion" by March 6, 2019, and it provided that these dates "shall only be adjusted by Change Order as provided under this Agreement." The

4

Agreement included a liquidated damages clause providing that, if substantial completion occurs after the agreed-upon date, Wood Group "shall, following a grace period of five (5) days, pay to [Targa] as liquidated damages twenty-five thousand dollars ($25,000) per Day for each Day of delay until Substantial Completion occurs, up to a maximum aggregate of one million dollars ($1,000,000)." In the event that Wood Group completed construction early, however, the Agreement provided for an early-completion bonus.

The Agreement provided that Wood Group "reviewed the information that forms the Agreement [and] the Scope of Work" and "warrants and represents that such information is adequate and complete to construct the Pipeline for the Contract Price, within the required times set forth in the Project Schedule." Wood Group further warranted "that it will make all investigations and inspections that it deems necessary to perform the Work in accordance with the Project Schedule, and understands the climate, terrain and other difficulties that it may encounter in performing the Work. . . ."

The Agreement stated that Wood Group

assumes all risks related to, and waives any right to claim an adjustment in the Contract Price or the Project Schedule in respect of, any failure to timely perform the Work in accordance with the Project Schedule as a result of any conditions of the Site or any other locations where the Work is performed, including . . . climactic conditions and seasons (excluding Force Majeure events)[.]

5

The Agreement defined "Force Majeure" as including, among other things, "catastrophic storms or floods, tornadoes, hurricanes, earthquakes and other acts of God[.]" The Agreement stated:

> [Wood Group's] obligations under this Agreement shall be suspended to the extent that performance of such obligations is delayed by Force Majeure. . . . If the commencement, prosecution or completion of any Work is delayed by Force Majeure, then [Wood Group] shall be entitled to an extension to the Guaranteed Substantial Completion Date or Guaranteed Final Completion Date if such delay affects the performance of any work that is on the critical path of the Project Schedule . . . and [Wood Group] complies with the notice and Change Order request requirements in Section 6.5. . . .

The Agreement expressly provides that the "Parties agree that [Wood Group's] sole remedy for such delay [caused by Force Majeure events] shall be an adjustment to the Guaranteed Substantial Completion Date or Guaranteed Final Completion Date pursuant to a Change Order and [Wood Group] expressly waives any damages for delay regardless of how caused." The Agreement further stated, "No obligations of a Party to pay moneys under or pursuant to this Agreement shall be excused by reason of Force Majeure."

Article 6 of the Agreement set out detailed provisions to govern "Changes, Force Majeure, and Owner-Caused Delay." The Agreement provided:

> No change in the requirements of this Agreement, whether an addition to, deletion from, suspension of or modification to this Agreement, including any Work, shall be the basis for an adjustment [or] any change in the Contract Price, the Project Schedule, any Work, the Payment Schedule, or any other obligations of [Wood Group] or right of [Targa] under this Agreement unless and until such addition,

6

deletion, suspension or modification has been authorized by a Change Order executed and issued in accordance with and in strict compliance with the requirements of this Article 6.

Relevant here, the Agreement provided circumstances under which Wood Group would be entitled to Change Orders:

i. [Wood Group] shall have the right to a Change Order in the event of any of the following occurrences:

1. Changes in Law that materially and adversely affect [Wood Group's] actual cost. . . ;

2. Acts or omissions of [Targa], that constitute a material breach of this Agreement by [Targa] and materially and adversely affect [Wood Group's] actual cost (which cost shall be adequately documented and supported) of performance of the Work or ability to perform any material requirement under this Agreement and, with respect to delays . . . caused by [Targa] or any Person acting on behalf or under the control of [Targa], compensation and a time extension to the Project Schedule to the extent allowed under Section 6.8;

3. Force Majeure to the extent allowed under Section 6.7.i;

. . . .

ii. Should [Wood Group] desire to request a Change Order under this Section 6.2, [Wood Group] shall, pursuant to section 6.5, notify [Targa] in writing and issue to [Targa], at [Wood Group's] expense, a request for a proposed Change Order in the form attached hereto as Schedule C-3, a detailed explanation of the proposed change and [Wood Group's] reasons for proposing the change, all documentation necessary to verify the effects of the change on the Changed Criteria, and all other information required by Section 6.5.

Section 6.5 of the Agreement sets out the timing requirements for notifications and change order requests made by Wood Group.

7

It provides:

Should [Wood Group] desire to seek an adjustment to the Contract Price, the Project Schedule, the Guaranteed Substantial Completion Date or Guaranteed Final Completion Date, the Payment Schedule, or any other modification to any other obligation of [Wood Group] under this Agreement for any circumstance that [Wood Group] has reason to believe may give rise to a right to request the issuance of a Change Order, [Wood Group] shall, with respect to each circumstance:

i. notify [Targa] in writing of the existence of such circumstance within seven (7) Days of the date that [Wood Group] knew or reasonably should have known of the first occurrence or beginning of such circumstance. . . . In such notice, [Wood Group] shall state in detail all known and presumed facts upon which its claim is based, including [the fact enumerated in this section]. . . . [Wood Group] shall only be required to comply with the notice requirements of this Section 6.5.i once for continuing circumstances, provided the notice expressly states that the circumstance is continuing. . . .

ii. submit to [Targa] a request for a proposed Change Order as soon as reasonably practicable after giving [Targa] written notice but in no event later than seven (7) Days after the completion of each such circumstance. . . .

The Parties acknowledge that [Targa] will be prejudiced if [Wood Group] fails to provide the notices and proposed Change Orders as required under this Section 6.5, and agree that such requirements are an express condition precedent necessary to any right for an adjustment in Contract Price, the Guaranteed Substantial Completion Date or Guaranteed Final Completion Date, Payment Schedule, any Work, or any other modification to any other obligation of [Wood Group] under this Agreement. Verbal notice, shortness of time, or [Targa's] actual knowledge of a particular circumstance shall not waive, satisfy, discharge or otherwise excuse [Wood Group's] strict compliance with this Section 6.5. Failure by [Wood Group] to comply with the requirements of this Section 6.5 shall constitute a waiver of [Wood Group's] right to request a Change Order at a later time.

The parties agreed that Change Orders approved under the terms of the Agreement

> shall constitute a full and final settlement and accord and satisfaction of all effects of the change as described in the Change Order upon the Changed Criteria and shall be deemed to compensate [Wood Group] fully for such change. Accordingly, [Wood Group] expressly waives and releases any and all right to make a claim or demand or to take any action or proceedings against [Targa] for any other consequences arising out of, relating to, or resulting from such change reflected in such Change Order, whether the consequences result directly or indirectly from such change reflected in such Change Order, including any claims or demands that any Change Order or number of Change Orders, individually or in the aggregate, have impacted the unchanged Work.

The Agreement also included provisions requiring notice and an opportunity to cure in the event either party defaulted.

The Agreement consisted of several different sets of documents and provided an order of priority for resolving any conflicts in the various documents:

> The documents that form this Agreement are listed below in order of priority, with the document having the highest priority listed first and one with the lowest priority listed last. . . . [I]n the event of any conflict or inconsistency between a provision in one document and a provision in another document, the document with the higher priority shall control. . . . This Agreement is composed of the following documents, which are listed in priority: (i) Change Orders or written amendments to this Agreement; (ii) this Agreement; and (iii) Exhibits and Schedules to this Agreement.

Included among the attached exhibits was a list of "Clarifications" from Wood Group, dated August 30, 2018, prior to the execution of the Agreement. This list was prefaced with the statement that "[t]he following are included to clarify

9

company's scope of work. Any of these clarifications that do not meet the intent of your request for bid can be discussed further and negotiated between [Targa] and [Wood Group]." This list included "Clarification 5," which stated, "Any costs incurred for work stoppages, move [a]rounds, or delays caused by Targa; or that are due to natural disasters beyond our control, will be charged at the rates depicted in the Wood Labor and Equipment Rate Sheets or the unit pricing submitted with the proposal."

## B. Performance and Change Orders

In the fall of 2018, after construction began, the parties determined that a significantly increased number and length of HDD bores were needed to complete the project, and they addressed these changes through the change order provisions set out in the Agreement. The project further experienced various delays and challenges, including significant flooding in the fall of 2018[1] and higher-than-average rainfall continuing into the spring of 2019. Wood Group also experienced personnel changes and turnover.

Significant here, the parties executed Change Order 3 on January 28, 2019. Change Order 3 addressed the need to drill more HDD bores than the plans

---

[1] Wood Group points out in its response to the motion for summary judgment that the governor declared a state of disaster on October 19, 2018, due to flooding in two of the counties where construction was taking place. Wood Group also pointed to data from the National Oceanic Atmospheric Administration indicating that the area where the project was located typically averages 36.76 inches of rainfall annually, but the actual rainfall from August 2018 through August 2019 was nearly double that amount, at 63.88 inches.

originally called for, stating that it "fully addresses the matters identified in the December 13, 2018 letter and email regarding additional scope of work sent by Contractor Project Manager Thomas Ganci." The referenced December 13, 2018 letter addressed revised HDD per-foot pricing, manpower and scheduling, and the involvement of the necessary subcontractors. The estimated length of the HDD drilling increased from approximately 46,200 linear feet to 76,400 linear feet.

In Change Order 3, the parties agreed that Targa would pay an additional fixed cost of $1.3 million "as full and complete compensation for additional equipment, labor, tools, rental, mobilization, subsistence, and all other potential cost or expense to complete all bores (regardless of quantity, length, type or difficulty)." This payment was "in addition to the per foot prices" included in the Agreement. Change Order 3 also amended the unit price for "mats," and it extended the completion dates.

Change Order 3 further stated:

Prior to the execution of this Change Order, [Wood Group] reviewed all necessary information related to the changes contemplated by this Change Order and the calculation of the lump sum Contract Price. [Wood Group] hereby represents and warrants that such information is adequate and complete in order for [Wood Group] to enter into this Change Order. Accordingly, [Wood Group] hereby (i) agrees that after the execution of the Change Order it shall have no right to claim or seek an increase in the Contract Price or an adjustment to the Project Schedule and guaranteed completion dates based upon information [Wood Group] knew or should have known or events occurring prior to the date of the Change Order and (ii) hereby waives and releases [Targa] from and against such claims.

11

As construction on the project continued, Wood Group eventually submitted new requested change orders seeking more than $25 million in additional costs. In May and June 2019, Wood Group submitted the following requested change orders:

- Change Order 5, dated April 25, 2019, seeking nearly $5 million for costs and delays related to severe weather occurring from September 2018 through April 2019;

- Change Order 6, dated April 15, 2019, seeking nearly $1.8 million for costs and delays related to what it referred to as a "rerouting" of the pipeline;

- Change Order 7, seeking $765,376 and for costs and delays related to inadequate access to the jobsite;

- Change Order 8, dated April 30, 2019, seeking approximately $1.5 million for other costs and delays to "address the additional costs and time incurred by [Wood Group] due to major changes made by the Company during the execution of the Work due to the lack of Temporary Workspace (TWS) for Pipe String/Welding and midline welding required during the pull back";

- Change Order 9, seeking $21,944,789.40 for costs and delays related to HDD drilling during the "second half of the project";

- Change Order 10, seeking $62,500 for costs and delays related to "availability of yards and laydowns";

- Change Order 11, dated June 27, 2019, seeking more than $1.8 million for costs and delays related to severe weather occurring from May 2019 through June 2019.

Wood completed construction on the pipeline on July 3, 2020. On September 4, 2020, Targa informed Wood Group that Targa refused to pay the

majority of the additional change orders, based on its belief that Wood Group's claims for additional funds were barred by the terms of the Agreement or by the release and waiver in Change Order 3. However, Targa approved portions of some of the change order requests and incorporated them into Change Order 12, agreeing to pay more than $16 million "for unit item true up." Targa rejected the remaining change orders.

In November 2020, Wood Group submitted two more requested change orders. Change Order 13 sought a 125-day extension and $15.5 million for costs and delays related to "substantial scope growth, failure to provide temporary workspace, and adverse weather conditions." Change Order 14 sought $822,204 "for wireline costs associated with fourteen (14) HDD Bores which were added/changed by the Company in relation to the original Project Scope, both in length/depth."

Targa paid Wood Group what Targa believed to be the full contract price of $60,104,766.70 on December 17, 2020. Wood Group, however, continued to assert its right to additional payments under the Agreement.

## C.    Lawsuit

Targa filed a suit for declaratory judgment seeking "to finally settle the rights, obligations, and legal relations of the parties under their agreement." Targa alleged that it had agreed to "an adjusted Contract Price, including validly

submitted Change Orders, including an assessment of liquidated damages, of $60,104,766.70,"[2] but Wood Group "wrongly claims entitlement to an adjusted Contract Price of $88,330,920." It asked the trial court to "declare that Wood Group is not entitled to Change Orders 5, 7, 8, 9, 11, 13, and 14, resolving the parties' dispute." Targa also sought its attorney's fees pursuant to Civil Practice and Remedies Code section 37.009.

Wood Group countersued. It alleged that Targa materially breached the Agreement by:

> a) failing to deliver the workspace and additional workspace as agreed; b) causing other disruption, delay and additional unanticipated cost for Wood to complete its work; c) failing to cure its continuous performance deficiencies, despite notice by Wood; and d) failing and refusing to compensate Wood pursuant to the change order procedure.

Wood Group also alleged a cause of action for quantum meruit "[i]n the event that it is determined that the work performed by Wood [Group] was beyond the cope of the Contract and/or not covered by the Contract." And Wood Group alleged that "Targa's actions and inactions constitute a cardinal change and breach of contract in that Wood [Group's] work was drastically altered from that which [it] originally agreed to perform."

---

[2]     Targa alleged that this amount "represents the original Contract Price, plus agreed Change Orders, minus $1,000,000 in liquidated damages, which Wood Group owes pursuant to Section 5.2.iii of the Agreement due to its failure to meet the Guaranteed Substantial Completion Date."

14

Targa answered Wood Group's counterclaim and asserted that "an express contract govern[ed] the subject matter of the dispute." Targa further asserted the affirmative defenses of accord and satisfaction and waiver and release of claims, among others. Targa also "expressly denie[d] that Wood Group [had] met all conditions precedent necessary to prevail on its claims. Specifically, Wood Group failed to submit change orders in the time and manner required by Article 6 and other provisions of the Agreement."

Targa moved for summary judgment on multiple grounds, asserting that it was entitled to summary judgment both on Wood Group's counterclaims and on its own declaratory judgment claims. Targa argued that the release and waiver in Change Order 3 applied to foreclose the majority of the change order requests made by Wood Group because those requests involved conditions that were or should have been known to Wood Group when it executed Change Order 3 in January 2019. Targa further argued that it was entitled to summary judgment because the Agreement bars Wood Group's claims for additional compensation. Targa likewise argued that it was entitled to summary judgment on its declaratory judgment claim for the same reasons.

The trial court granted Targa's motion for summary judgment. In the final judgment rendered on the basis of the summary judgment, the trial court ordered generally that Wood Group take nothing on its counterclaims. The trial court also

15

granted Targa the declaratory relief it requested, making the following declarations:

i. Wood Group is not entitled to receive any monetary compensation for delays relating to "adverse weather conditions," "Acts of God," or other Force Majeure events. Wood Group is only entitled to a Change Order under the exclusively-enumerated circumstances of Section 6.2.i of the Agreement, and therefore is not entitled to Change Orders for any other reason;

ii. Wood Group is not entitled to a Change Order if it failed to provide notice to Targa within seven (7) days of the date Wood Group knew or reasonably should have known of the first occurrence or beginning of such circumstance giving rise to the Change Order;

iii. Wood Group is not entitled to a Change Order if it failed to submit a request for a proposed Change Order as soon as practicable, and in no event later than seven (7) days after the completion of each such circumstance, including submission of project records required by Section 6.5.ii of the Agreement;

iv. Wood Group is not entitled to costs associated with increased bores, regardless of length or quantity, or for any other matters giving rise to a Change Order that were known or should have been known to Wood Group on or before January 7, 2019, due to its execution of Change Order 3;

v. Once a Change Order is executed, that Change Order acts as a "full and final settlement and an accord and satisfaction of all effects of that Change Order" and was deemed to compensate Wood Group fully for such change pursuant to Section 6.4 of the Agreement;

vi. Change Order 3 constituted an accord and satisfaction of all claims for increases to the Contract Price or changes to the Guaranteed Substantial Completion Date and Guaranteed Final Completion Date contained within Change Order Requests 6, 7, 8, 9, 13, and 14;

vii. Wood Group is not entitled to Change Order Requests 5, 6, 7, 8, 9, 11, 13, and 14.

16

The trial court also awarded Targa $250,000 in attorney's fees.

## Summary Judgment

In four issues on appeal, Wood Group argues that the trial court erred in granting summary judgment in favor of Targa.

### A.    Standard of Review

We review de novo the trial court's ruling on a motion for summary judgment. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). A party moving for traditional summary judgment has the burden to prove that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *SeaBright Ins. Co. v. Lopez*, 465 S.W.3d 637, 641 (Tex. 2015). And, to be entitled to summary judgment on Wood Group's counterclaims, Targa must (1) disprove at least one essential element of Wood Group's causes of action or (2) plead and conclusively establish each essential element of an affirmative defense, thereby defeating Wood Group's cause of action. *See Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex. 1995). An issue is conclusively established if reasonable minds could not differ about the conclusion to be drawn from the facts in the record. *Cmty. Health Sys. Prof'l Servs. Corp. v. Hansen*, 525 S.W.3d 671, 681 (Tex. 2017).

If the movant meets its burden, the burden then shifts to the nonmovant to raise a genuine issue of material fact precluding summary judgment. *See Centeq*

*Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995). To determine whether there is a fact issue in a motion for summary judgment, we review the evidence in the light most favorable to the nonmovant, crediting favorable evidence if reasonable jurors could do so, and disregarding contrary evidence unless reasonable jurors could not. *See Fielding*, 289 S.W.3d at 848 (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)). The evidence raises a genuine issue of fact if reasonable and fair-minded jurors could differ in their conclusions in light of all of the summary judgment evidence. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007); *City of Keller*, 168 S.W.3d at 822–24.

**B.     Change Order 3 Releases Claims Known Prior to January 2019**

Targa moved for summary judgment on Wood Group's counterclaims and on its own claim for a declaratory judgment, and the trial court expressly granted relief on both bases.

Targa argued that the dispute between the parties could be resolved as a matter of law based on the parties' Agreement as modified by the approved change orders and that Wood Group "has been fully paid and is entitled to nothing more from Targa." It argued generally that Wood Group's breach of contract claims were all prohibited by the terms of the parties' Agreement.

Specifically, Targa argues that Wood Group was seeking compensation for changes or relief that it expressly released and waived when it executed Change

Order 3. The parties entered into Change Order 3 to address an increase in the scope of the project when Wood Group realized that significantly more HDD bores would be required than the parties originally planned. Change Order 3 referenced the December 13, 2018 letter of project manager Thomas Ganci, which addressed revised HDD per-foot pricing, manpower and scheduling, and the involvement of the necessary subcontractors.

In Change Order 3, the parties agreed that Targa would pay an additional fixed cost of $1.3 million "as full and complete compensation for additional equipment, labor, tools, rental, mobilization, subsistence, and all other potential cost or expense to complete all bores (regardless of quantity, length, type or difficulty)." This payment was "in addition to the per foot prices" included in the Agreement. Change Order 3 also extended the completion date for the Project.

Change Order 3 further included a broad release provision:

> [Wood Group] hereby (i) agrees that after the execution of the Change Order it shall have no right to claim or seek an increase in the Contract Price or an adjustment to the Project Schedule and guaranteed completion dates based upon information [Wood Group] knew or should have known or events occurring prior to the date of the Change Order and (ii) hereby waives and releases [Targa] from and against such claims.

Citing the broad release language in Change Order 3, Targa argued that Wood Group agreed to release its right to claim or seek an increase in the Contract Price

based on information Wood Group knew or should have known prior to January 2019.

A release is a "written agreement that discharges a duty or obligation owed to one party to the release" and "operates to extinguish the claim . . . and is an absolute bar to any right of action on the released matter." *MMR Constructors, Inc. v. Dow Chem. Co.*, No. 01-19-00039-CV, 2020 WL 7062325, at *6 (Tex. App.— Houston [1st Dist.] Dec. 3, 2020, no pet.) (citing *Henry v. Masson*, 333 S.W.3d 825, 843–44 (Tex. App.—Houston [1st Dist.] 2010, no pet.) and *Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 508 (Tex. 1993)). A release is a contract subject to the rules of contract construction. *Id.* Thus, we read the contract as a whole and must examine the entire contract to harmonize and give effect to all its provisions. *Id.* We give the release's language its plain grammatical meaning unless doing so would defeat the intent of the parties. *Id.*

"To effectively release a claim, the releasing instrument must 'mention' the claim to be released," and "[c]laims that are not clearly within the subject matter of the release are not discharged, even if they exist when the release is executed." *Id.* (citing *Victoria Bank & Tr. Co. v. Brady*, 811 S.W.2d 931, 938 (Tex. 1991) and *Henry*, 333 S.W.3d at 844). "It is not necessary, however, that the parties anticipate and identify every potential cause of action relating to the subject matter of the release." *Id.* (citing *Keck, Mahin & Cate v. Nat'l Fire Ins. Co.*, 20 S.W.3d 692, 698

20

(Tex. 2000)). "Although releases generally contemplate claims existing at the time of execution, a valid release may also encompass unknown claims and future damages." *Id.*

Here, the trial court ordered generally that Wood Group take nothing on its counterclaims, and it declared, in part, that "Wood Group is not entitled to costs associated with increased bores, regardless of length or quantity, or for any other matters giving rise to a Change Order that were known or should have been known to Wood Group on or before January 7, 2019, due to its execution of Change Order 3." The trial court further declared, "Change Order 3 constituted an accord and satisfaction of all claims for increases to the Contract Price or changes to the Guaranteed Substantial Completion Date and Guaranteed Final Completion Date contained within Change Order Requests 6, 7, 8, 9, 13, and 14."

The trial court's declarations track the express language of the Agreement and Change Order 3. While Change Order 3 makes specific reference to a change in the scope of the project and the number of HDD bores, it also contains broader language that implicates the Agreement as a whole. Change Order 3 added a "lump sum" contract price and extended the completion date for the entire project. The language of the release in Change Order 3 is likewise broad, stating that Wood Group agreed to release any further claims "based upon information [it] knew or should have known or events occurring prior to the date of the Change Order."

This language, by its plain terms, covers issues such as the weather event in the fall of 2018 and impacts from changes in the scope of work or other issues that arose prior to January 2019. *See id.* (holding that courts give release's language its plain grammatical meaning and that released claims must be mentioned in releasing instrument).

Nevertheless, in its third issue, Wood Group argues that the trial court erred in its construction of the scope of the release and waiver provision in Change Order 3. Wood Group argues that the release and waiver applied only to claims addressed in Change Order 3, and it challenges the trial court's conclusion that Change Order 3 constituted an "accord and satisfaction" of "all claims" contained in the other requested change orders. This argument, however, misconstrues both the trial court's declaration and the terms of the parties' Agreement and Change Order 3.

The trial court did not declare that "all claims" contained in Wood Group's requested change orders were released by Change Order 3. Rather, the trial court's declarations tracked the language of the release itself. The trial court declared:

> iv. Wood Group is not entitled to costs associated with increased bores, regardless of length or quantity, or for any other matters giving rise to a Change Order that were known or should have been known to Wood Group on or before January 7, 2019, due to its execution of Change Order 3;
>
> v. Once a Change Order is executed, that Change Order acts as a "full and final settlement and an accord and satisfaction of all effects of that

Change Order" and was deemed to compensate Wood Group fully for such change pursuant to Section 6.4 of the Agreement;

The trial court then identified specific change order requests that were based on changes in scope or other concerns that were related to the changes made to the project prior to the execution of Change Order 3, declaring, "Change Order 3 constituted an accord and satisfaction of all claims for increases to the Contract Price or changes to the Guaranteed Substantial Completion Date and Guaranteed Final Completion Date contained within Change Order Requests 6, 7, 8, 9, 13, and 14."[3] We agree with the trial court's conclusion that the release in Change Order 3 precluded Wood Group from seeking further payment related to changes in the scope of the project or other circumstances that occurred or were known to Wood Group prior to January 2019.

Change Order 3 addresses the change in scope of the project caused by the increased number of HDD bores. The language of Change Order 3 expressly referenced more than just the cost of additional HDD bores—it referenced "compensation for additional equipment, labor, tools, rental, mobilization, subsistence, and all other potential costs or expenses to complete all bores

---

[3] Change Order Request 6 addressed expenses related to "rerouting"; Requests 7 and 8 involved access to the worksite on the rerouted project; Request 9 involved increased HDD costs from the "second half" of the project, despite the fact that Wood Group failed to show any significant change in the project's scope after January 2019; and Requests 13 and 14 addressed costs for "scope growth" and "additional costs," again without identifying any significant changes in scope that occurred after January 2019.

(regardless of quantity, length, type or difficulty)."[4] These references to the calculation of the "lump sum price" and adjustment to the project deadlines addressed impacts to the entirety of the project. The language of Change Order 3 further confirms that Wood Group had "reviewed all necessary information related to the change contemplated by this Change Order and the calculation of the lump sum Contract Price" and that Wood Group "warrant[ed] that such information is adequate and complete." The release language itself contains broad language, stating that Wood Group "shall have no right to claim or seek an increase in the Contract Price or an adjustment to the Project Schedule and guaranteed completion dates based upon information Contractor knew or should have known or events occurring prior to the date of the Change Order."

We conclude that the trial court did not err in concluding that the release in Change Order 3 precluded Wood Group's attempt to recover under the contract for issues or conditions that it knew or should have known existed prior to January 2019.

We overrule Wood Group's third issue.

---

[4] This language from Change Order 3 tracks with the language from the Agreement regarding the effect of change orders. Section 6.4 of the Agreement provides that Change Orders agreed under the terms of Article 6 "shall constitute a full and final settlement and accord and satisfaction of all effects of the change as described in the Change Order upon the changed criteria and shall be deemed to compensate Contractor fully for such change."

## C. Agreement Bars Wood Group's Remaining Claims

Targa further argued in the trial court that the terms of the Agreement precluded Wood Group's breach of contract claims and supported Targa's right to summary judgment on its own claims for declaratory judgment. Specifically, Targa argued that Wood Group was not entitled to additional compensation for inclement weather because the Agreement stated that Wood Group was not entitled to financial compensation for force majeure events and because Wood Group assumed the risk of inclement weather that does not rise to the level of a force majeure event.

Targa also argued that Wood Group sought compensation for change orders that were "waived" under the terms of the Agreement because of Wood Group's "late submission of the change," observing that the Agreement required written notice within seven days of the date Wood Group knew or should have known of circumstances giving rise to a change order as a condition precedent to the right to approval of the change order. The Agreement also required Wood Group to submit the change order request within seven days after completion of the circumstances giving rise to the change. Targa asserted that Wood Group did not comply with either of these requirements in connection with the claims in this lawsuit.

Targa correctly points out that the parties' Agreement requires that the parties follow the change order procedure set out in Article 6 to change the contract price, providing:

> No change in the requirements of this Agreement, whether an addition to, deletion from, suspension of or modification to this Agreement, including any Work, shall be the basis for an adjustment [or] any change in the Contract Price, the Project Schedule, any Work, the Payment Schedule, or any other obligations of Contractor or right of Owner under this Agreement unless and until such addition, deletion, suspension or modification has been authorized by a Change Order executed and issued in accordance with and in strict compliance with the requirements of this Article 6.

The Agreement provided circumstances under which Wood Group would be entitled to change orders, including to respond to "[a]cts or omissions of [Targa], that constitute a material breach of the Agreement by [Targa] and materially and adversely affect [Wood Group's] actual cost" and "force majeure" events. The Agreement further provides that, to request the issuance of a Change Order, Wood Group "shall, with respect to each circumstance . . . notify [Targa] in writing of the existence of the circumstance within seven (7) Days of the date that [Wood Group] knew or reasonably should have known of the first occurrence or beginning of such circumstance."

Targa asserted in the trial court and on appeal that Wood Group did not provide the notice required by the Agreement for any of the concerns purportedly arising after the execution of Change Order 3 in January 2019. For example, Targa

26

asserts that it received notice that severe weather events occurring in September and October 2018 impacted the project's schedule, and those concerns were addressed in the schedule extension agreed to in Change Order 3. It asserted that Wood Group provided no force majeure notices for additional delays after January 2019. It received only Wood Group's Change Order Requests 5 and 11, and, thus, Wood Group failed to satisfy a condition precedent to obtain a change order. Because it did not follow the contractual terms for obtaining a change order, Wood Group is not entitled under the Agreement for any further compensation or adjustments related to weather delays.

Targa likewise asserted, in the trial court and on appeal, that Wood Group did not provide the contractually-required notice of conditions that would give rise to change orders adjusting the contract price for Wood Group's claims related to Targa's purported failure to provide temporary workspace (Change Order Request 8), additional expenses caused by the increased number of HDD bores (Change Order Requests 6 and 9), and the coordination and timing of work by tie-in welding crews (Change Order Request 7). Again, because Wood Group failed to provide notice of these circumstances within the time and in the format required by the Agreement, it failed to demonstrate that it was entitled to a change order under the terms of the Agreement, and it cannot establish that Targa breached the Agreement by failing to pay additional costs.

27

The trial court agreed with Targa, concluding that Wood Group should take nothing on its counterclaims. The trial court further declared, in granting Targa's claim for declaratory judgment, that "Wood Group is not entitled to a Change Order if it failed to provide notice to Targa within seven (7) days of the date Wood Group knew or reasonably should have known of the first occurrence or beginning of such circumstance giving rise to the Change Order." The trial court specifically declared that "Wood Group is not entitled to Change Order Requests 5, 6, 7, 8, 9, 11, 13, and 14."

In its fourth issue, Wood Group argues that the trial court erred to the extent it granted summary judgment based on Targa's assertions of untimeliness of the notices of a change order request pursuant to the Agreement.

Wood Group argued in its response to the motion for summary judgment and on appeal that the Agreement's notice requirements were "void under Texas Law," citing Civil Practice and Remedies Code section 16.071. Section 16.071(a) provides, "A contract stipulation that requires a claimant to give notice of a claim for damages as a condition precedent to the right to sue on the contract is not valid unless the stipulation is reasonable. A stipulation that requires notification within less than 90 days is void." TEX. CIV. PRAC. & REM. CODE § 16.071(a).

We conclude, however, that section 16.071 does not apply here to void the Agreement's requirement that Wood Group give Targa notice of any circumstance

28

within seven days of the date Wood Group knew or reasonably should have known of the first occurrence or beginning of such circumstance giving rise to the request for a change order. In *El Paso County v. Sunlight Enterprises Co.*, the El Paso Court of Appeals addressed a contention similar to the one Wood Group makes here. 504 S.W.3d 922, 926–30 (Tex. App.—El Paso 2016, no pet.). The court in *Sunlight Enterprises* observed that the plain language of section 16.071 "applies to a contract stipulation that requires a claimant to give a 'notice of a claim for damages' as a condition precedent to the right to sue on the contract." *Id.* at 926 (quoting TEX. CIV. PRAC. & REM. CODE § 16.071(a)). The El Paso Court relied on precedent narrowly construing section 16.071's language about a "notice of a claim for damages" as meaning "notice of a cause of action." *Id.* at 927 (citing *Komatsu v. U.S. Fire Ins. Co.*, 806 S.W.2d 603, 605–06 (Tex. App.—Fort Worth 1991, writ denied), which cited *Citizens' Guar. State Bank v. Nat'l Sur. Co.*, 258 S.W. 468, 470 (Tex. Comm'n App. 1924, judm't adopted)).

The court in *Sunlight Enterprises* ultimately determined that a contractual provision imposing a "seven-day submission deadline on a 'claim for an increase in the Contract Price' and a 'claim for an extension of time'" did not constitute a "notice of a claim for damages as a condition precedent to the right to sue on the contract" under section 16.071. *See id.* at 926, 928–29. The El Paso Court concluded that "contractual notice provisions do not fall within Section 16.071(a)

29

when they require notice of the happening of some event that is antecedent to the accrual of a cause of action and from which a cause of action may or may not arise." *Id.*at 928; *see also Am. Airlines Employees Fed. Credit Union v. Martin*, 29 S.W.3d 86, 89, 97 (Tex. 2000) (holding that deposit agreement requiring customers to give notice of any unauthorized transactions within 60 days, or waive any objections, does not violate section 16.071(a), because "by its terms" statute does not apply "when the notice to be given is not notice of a claim for damages, but rather notice of unauthorized transactions"); *Cmty. Bank & Trust v. Fleck*, 107 S.W.3d 541, 542 (Tex. 2002) (per curiam) (holding that 14-day notice provision for unauthorized transactions in deposit account was not "notice of a claim for damages" under section 16.071(a)).

Here, as in *Sunlight Enterprises*, the Agreement's provisions requiring notice as a condition precedent to obtaining a change order are not a requirement of notice of a claim for damages under section 16.071(a). *See* 504 S.W.3d at 928–29. Rather, the Agreement's requirement for timely notice as a condition precedent to obtaining a change order serves the purpose of providing Targa, as the owner, of notice of events that might give rise to a change to the contract price or completion date. The Agreement itself states that Targa "will be prejudiced if [Wood Group] fails to provide the notices and proposed Change Orders as required under this Section 6.5." As the court in *Sunlight Enterprises* recognized, the notice provisions

30

in the Agreement here "simply require 'notice of the happening of an event'" prior to any accrual of a cause of action, and the event "may or may not result" in a breach of contract claim. *See id.* at 929. Thus, this provision does not implicate section 16.071(a).

By entering into the Agreement, Wood Group agreed to the provisions governing its right to obtain a change order, including the notice requirements, and it agreed that failure to provide timely notice would result in waiver of a claim. *See id.* at 930 (citing *In re Border Steel, Inc.*, 229 S.W.3d 825, 834 (Tex. App.—El Paso 2007, orig. proceeding) ("One who signs a contract is legally held to have known what words were used in the contract, to have understood their meaning, and to have comprehended the legal effect of the contract.")); *see also In re Bank One, N.A.*, 216 S.W.3d 825, 826 (Tex. 2007) (orig. proceeding) (holding that presumption exists that party who signs contract knows its contents). "Texas strongly favors parties' freedom of contract, which allows parties to bargain for mutually agreeable terms and allocate risks as they see fit." *Sunlight Enters.*, 504 S.W.3d at 930 (citing *Gym–N–I Playgrounds, Inc. v. Snider*, 220 S.W.3d 905, 912 (Tex. 2007)).

Wood Group entered into the Agreement, which required it to provide written notice of circumstances that might give rise to a change order within seven days or waive its right to recovery. After agreeing to Change Order 3, which

31

addressed circumstances or concerns arising prior to January 2019, Wood Group failed to provide such timely notice with regard to any circumstances or events occurring after January 2019.

Wood Group also argues that that it provided notice of weather events causing delays and issues related to right-of-way and temporary workspace "early in the project and these issues persisted throughout the project." It also argues that "[w]hether [Wood Group] timely delivered these submissions is fundamentally a fact driven determination that is not ripe for summary adjudication[.]" We disagree and conclude that Wood Group failed to present sufficient evidence to raise a genuine issue of material fact that it provided the contractually-required notice. *See* TEX. R. CIV. P. 166a; *Centeq Reatly, Inc.*, 899 S.W.2d at 197 (holding that nonmovant must raise genuine issue of material fact to preclude summary judgment).

Wood Group argued in its summary judgment response that numerous issues caused an increase in its costs and delays, including (1) Targa's failure to provide the required access to the right-of-way (ROW) and to temporary workspace (TWS), (2) excessive rains, and (3) work scope changes. It argues that the outstanding change order requests addressed costs and impacts from these causes that were not addressed by the approved change orders, and it argues that its notices to Targa about these issues constituted "substantial compliance" with the

Agreement's provisions. Wood Group pointed to various emails or notices that it claims raise at least a fact question regarding whether it complied with the Agreement's change order procedure's notice requirements. Again, we disagree.

One such notice that Wood Group points to in its response to the motion for summary judgment and on appeal is an email from a Wood Group project coordinator regarding a "revised write up on [requested] CO#13." The attached document includes a "timeline" and a list of occasions on which "Wood noticed Targa on ROW issues" in messages dated between October 2018 and January 2019. For example, the list states there was a "28-Jan-19 Email from Jake Owens to Cody on back string of Bore #94."

This list, however, does not constitute timely contractual notice of a need for a change order under the Agreement. Most of the emails referenced were sent prior to the execution of Change Order 3. Only two messages identified in the list—messages purportedly sent on January 10 and January 28, 2019—could have addressed circumstances that had not been incorporated into Change Order 3. However, the entries on the list did not comply with the Agreement's provisions. To request a change order under the Agreement, Wood Group had to send Targa a timely, written notice that "state[d] in detail all known and presumed facts upon which its claim is based, including the character, duration and extent of such circumstance, the date [Wood Group] first knew of such circumstance, any

33

activities impacted by such circumstance, the cost and time consequences of such circumstance." The email and its attached list do not provide this information, and Wood Group does not identify a document or email that contains the information required by the Agreement in connection with the emails identified in the list.

Wood Group further argues that it first informed Targa of storm-related impacts in an email on October 25, 2018. It pointed to its own exhibits to its summary judgment response that included weather-delay notices for weather events occurring in September and October 2018.[5] These emails and notices informed Targa of excessive rain impacts and were sent within seven days after Governor Abbot declared Parker County and other nearby counties a natural disaster due to the flooding in fall 2018. Thus, these notices address impacts from weather that occurred in the fall of 2018, which preceded the execution of Change Order 3. Change Order 3 adjusted the lump sum contract price and extended the project deadline, and it released Wood Group's right to seek any further relief for conditions Wood Group knew or should have known prior to January 2019. Wood

---

[5] Two of the weather notices identified in Wood Group's summary judgment response were dated after January 2019. One, dated March 21, 2019, is an email forwarding an earlier weather notice from October 12, 2018. Thus, the March 21, 2019 notice did not point to any weather or force majeure events that occurred after the execution of Change Order 3. The other notice was a Force Majeure Notice, dated March 27, 2019. This notice identified the flooding that occurred in September and October 2018 as the force majeure event. Thus, all of the notices that Wood Group sent regarding force majeure or extreme weather referenced the flooding in the fall of 2018, which preceded Change Order 3's extension of the project deadline.

Group provided no evidence that it gave Targa notice of force majeure events or weather delays arising after January 2019.

Wood Group also argues that it provided notice of its ROW and TWS complaints, citing exhibits to its summary judgment response as "examples of notices [provided] as early as October 2018." These notices consisted of emails dated between November 4, 2018, and January 4, 2019. Wood Group made requests for things like extra workspace at various construction locations, extra mats to protect the ROW, and for Targa to mark specific portions of the ROW or designated TWS. These notices pre-date the execution of Change Order 3. Furthermore, while these emails request that Targa take certain actions, they do not notify Targa that it had failed to provide required ROW or TWS in such a way that it increased expenses or delayed construction, thus triggering Wood Group's right to a change order. We conclude that the emails identified by Wood Group do not raise a fact issue regarding whether Wood Group satisfied the contractual requirements to entitle it to a change order under the Agreement's terms.

With regard to both the weather impacts and ROW and TWS concerns, Wood Group argues that Targa was aware of the ongoing issues. It argues that "Targa was fully aware its conduct breached the [Agreement] and [was] fully aware those breaches were delaying performance and increasing costs." The Agreement, however, expressly disclaims that Targa's actual knowledge of a

35

circumstance is sufficient to satisfy the change order procedure. Section 6.5 of the Agreement expressly states, "Verbal notice, shortness of time, or [Targa's] actual knowledge of a particular circumstance shall not waive, satisfy, discharge or otherwise excuse [Wood Group's] strict compliance with this Section 6.5."

Wood Group also argues that these conditions were ongoing or continuous throughout the project and that "Targa engaged in continuous breaching conduct." But the ongoing nature of these concerns does not satisfy Wood Group's obligations under the Agreement to notify Targa of circumstances giving rise to a request for a change order. The procedure set out in Section 6.5 expressly addresses reporting "for continuing circumstances." The Agreement states that Wood Group "shall only be required to comply with the notice requirements of this Section 6.5.i once for continuing circumstances, provided the notice expressly states that the circumstance is continuing and includes [Wood Group's] best estimate of the time and cost consequences of such circumstance." Wood Group does not point to any evidence in the record demonstrating that it provided such notice of a continuing circumstance, or, in fact, of any circumstances that arose after January 2019 and the execution of Change Order 3.

Finally, Wood Group also pointed to a "Weekly Progress Report" for the week of May 4-10, 2019. This progress report identified areas of concern as part of its construction progress report, including "rock impacting tie-in" and weather

delays. Again, however, this weekly progress report does not comply with the contractually-required notice of circumstances giving rise to a change order. The Agreement provides a particular form for providing notice of a circumstance giving rise to a request for change order:

> Should [Wood Group] desire to request a Change Order under this Section 6.2, [Wood Group] shall, pursuant to Section 6.5, notify [Targa] in writing and issue to [Targa] . . . a request for a proposed Change Order in the form attached hereto as Schedule C-3, a detailed explanation of the proposed change and [Wood Group's] reasons for proposing the change, all documentation necessary to verify the effects of the change on the Changed Criteria, and all other information required by Section 6.5.

Section 6.5 further requires the notice to "state in detail all known and presumed facts upon which [the] claim is based," as discussed above.

The Weekly Progress Report serves a different contractual function. Section 3.15 of the Agreement provides that Wood Group was obligated to provide "[w]eekly progress reports . . . in a mutually acceptable form . . . reflecting the actual progress of the work against the Project Schedule[.]" Thus, the May 2019 progress report is not in the correct form, nor does it provide the contractually-required information, to constitute notice that Wood Group intended to invoke the change order procedure in connection with any of the matters discussed in the progress report.

Based on the language of the Agreement itself and the summary-judgment record, we conclude that Wood Group failed to give timely notice of any claim

37

giving rise to its right to a change order arising after January 2019 and execution of Change Order 3. Thus, Wood Group cannot establish its right to additional payments under the Agreement, and it cannot show that Targa breached the Agreement by failing to make payments for which the change order provisions were not properly invoked.

We overrule Wood Group's fourth issue.

## D. Remaining Issues

In its first issue, Wood Group argues that the trial court granted more relief than Targa requested when it granted summary judgment on Wood Group's claim that Targa breached Section 4.2 of the Agreement.[6] Section 4.2 is the portion of the Agreement that obligates Targa to provide certain ROW and TWS as set out in the contract documents.

---

[6] Targa argues that we can affirm the trial court's judgment because Wood Group did not challenge all potential grounds that could support the summary judgment. Targa implies that the summary judgment order does not state the grounds on which the trial court ruled. However, it does not appear that any of the grounds identified by Targa in its briefing could independently support the trial court's judgment. Furthermore, while the trial court generally denied Wood Group's counterclaims without stating the grounds on which it relied, the trial court also made related declarations based on Targa's own claims. *See Britton v. Tex. Dep't of Crim. Justice*, 95 S.W.3d 676, 681 (Tex. App.—Houston [1st Dist.] 2002, no pet.). ("[I]f an independent ground fully supports the complained-of ruling or judgment, but the appellant assigns no error to that independent ground, then (1) we must accept the validity of that unchallenged independent ground . . . and thus (2) any error in the grounds challenged on appeal is harmless because the unchallenged independent ground fully supports the complained-of ruling or judgment."). Thus, we considered the merits of Wood Group's claims, as set out above.

Targa, however, argued in its motion for summary judgment that its affirmative defenses, including the defense of waiver, and the language of the Agreement itself, prohibit all of Wood Group's breach of contract claims. Thus, Targa argues that it addressed Wood Group's breach of contract claim related to Section 4.2 by moving for summary judgment on the affirmative defenses of waiver, release, and accord and satisfaction, and by demonstrating that Wood Group failed to provide notice as a condition precedent to its claims.

As discussed above, we agree with Targa. The Agreement provides that to be entitled to additional money, i.e. a change in the contract price, Wood Group had to follow the procedures for obtaining a change order. Wood Group did not provide the contractually-required notice that would entitle it to a change order under the terms of the Agreement for any failure by Targa to provide access to the ROW or TWS. Thus, the trial court did not err in dismissing all of Wood Group's breach of contract counterclaims.

To the extent that Wood Group is arguing that Targa had to prove it provided all of the contractually promised easements and workspaces identified in the Alignment Sheets, we disagree. The parties agreed to the mechanism set out in the Agreement for addressing circumstances that Wood Group believed entitled it to an increase in the contract price. The change order procedure expressly applied to "[a]cts or omissions by [Targa], that constitute a material breach . . . and

materially adversely affect [Wood Group's] actual cost. . . ." Because Wood Group failed to demonstrate that it followed the Agreement's change order procedures, as a matter of law, Wood Group cannot recover any damages based on increased project costs even if those costs were purportedly due to Targa's failure to provide contractually-agreed upon ROW and TWS.[7]

We overrule Wood Group's first issue.

In its second issue, Wood Group argues that the trial court erred in concluding that Wood Group is "not entitled to receive any monetary compensation" for increased costs pursuant to the force majeure provisions in the Agreement as set out in Clarification 5. Because we have already concluded that Wood Group failed to provide the contractually-required notice as a condition precedent to obtaining any kind of relief through the Agreement's change order process, the question of what type of remedy the Agreement allowed is immaterial

---

[7] Targa argues that Wood Group has not challenged summary judgment on its claim for quantum meruit or cardinal change. Wood Group asserts that it asked this Court to reinstate its quantum meruit claim if the construction contract was invalidated. Here, however, the presence of an express contract covering the subject-matter of the parties' dispute exists—all of Wood Group's claims for damages involve whether Targa properly performed under the Agreement. The presence of the Agreement bars Wood Group from recovering under quantum meruit. *See In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 740 (Tex. 2005) (orig. proceeding); *Hassel Constr. Co. Inc. v. Springwoods Realty Co.*, No 01-17-00822-CV, 2023 WL 2377488, at *25–26 (Tex. App.—Houston [1st Dist.] Mar. 7, 2023, no pet.) (mem. op.).

to support our affirmance of the trial court's judgment dismissing Wood Group's breach of contract counterclaim.

To the extent that Wood Group is challenging as a separate issue the trial court's declaration that "Wood Group is not entitled to receive any monetary compensation for delays" caused by weather or force majeure events and instead is "only entitled to a Change Order under the exclusively-enumerated circumstances" set out in Article 6 of the Agreement, we disagree. We disagree with Wood Group's construction of the Agreement, and its argument that the provisions in Clarification 5 modify the terms of Article 6, limiting relief for force majeure events solely to an extension of the deadline.

The Agreement consisted of several different sets of documents and provided an order of priority for resolving any conflicts in the various documents:

> The documents that form this Agreement are listed below in order of priority, with the document having the highest priority listed first and one with the lowest priority listed last. . . . [I]n the event of any conflict or inconsistency between a provision in one document and a provision in another document, the document with the higher priority shall control. . . . This Agreement is composed of the following documents, which are listed in priority: (i) Change Orders or written amendments to this Agreement; (ii) this Agreement; and (iii) Exhibits and Schedules to this Agreement.

Applying this provision, any conflict between the main text of the Agreement itself and Clarification 5 must be resolved by giving priority to the provisions in the Agreement itself. The Agreement expressly provides that the

41

"Parties agree that Contractor's sole remedy for such delay [caused by Force Majeure events] shall be an adjustment to the Guaranteed Substantial Completion Date or Guaranteed Final Completion Date pursuant to a Change Order and Contractor expressly waives any damages for delay regardless of how caused." The Agreement further stated, "No obligations of a Party to pay moneys under or pursuant to this Agreement shall be excused by reason of Force Majeure."

We overrule Wood Group's second issue.

Finally, Wood Group argued that, if we reverse the summary judgment on any of the grounds asserted, we should also reverse the award of attorney's fees. Because we affirm the trial court's judgment ordering that Wood Group take nothing on its counterclaims and granting Targa declaratory relief, we decline to reverse the award of attorney's fees. *See* TEX. CIV. PRAC. & REM. CODE § 37.009; *Sohani v. Sunesara*, 608 S.W.3d 532, 538 (Tex. App.—Houston [1st Dist.] 2020, pet.) (holding that award of attorney's fees under Chapter 37 is within trial court's discretion and not dependent on finding that party substantially prevailed).

## Conclusion

We affirm the judgment of the trial court.


Richard Hightower
Justice

Panel consists of Justices Hightower, Rivas-Molloy, and Farris.